**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-6146**

UNITED STATES OF AMERICA,

Petitioner - Appellee,

v.

MIKEL BOLANDER,

Respondent - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Bernard A. Friedman, Senior District Judge, sitting by designation. (5:07-hc-02032-FL-JG)

Argued: May 15, 2013                    Decided: July 5, 2013

Before NIEMEYER and KEENAN, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge Hamilton wrote the opinion in which Judge Niemeyer and Judge Keenan joined.

**ARGUED:** Walter Hoytt Paramore, III, Jacksonville, North Carolina, for Appellant. Edward D. Gray, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas G. Walker, United States Attorney, Raleigh, North Carolina, for Appellee.

HAMILTON, Senior Circuit Judge:

The government certified Mikel Bolander as a "sexually dangerous person" under the Adam Walsh Act, 18 U.S.C. § 4248 (the Act). In the ensuing civil commitment proceeding, the district court found that the government had proven by clear and convincing evidence that Bolander is a sexually dangerous person under the Act. As a result, he was committed to the custody of the Attorney General of the United States. On appeal, Bolander challenges this ruling, and others, by the district court. We affirm.

I

A

The Act provides for the civil commitment of a "sexually dangerous person" following the expiration of their federal prison sentences. Id. § 4248(a). A sexually dangerous person is one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." Id. § 4247(a)(5). A person is considered "sexually dangerous to others" if "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." Id. § 4247(a)(6).

The Attorney General, his designee, or the Director of the Federal Bureau of Prisons (BOP) may initiate a § 4248 commitment proceeding in the district court for the district in which the person is confined by filing a certification that the person is sexually dangerous within the meaning of the Act. Id. § 4248(a). The filing automatically stays the release of the person from custody pending a hearing before the district court. Id. "If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court shall commit the person to the custody of the Attorney General." Id. § 4248(d).[1]

B

Bolander was born in Minnesota in 1964. During his adolescence, he abused alcohol and marijuana. At the age of twelve, he began to experience attraction to prepubescent boys, and he began to collect pictures from art books and nudist

---

[1] If an order of commitment is obtained, the Attorney General must first attempt to release the person to "the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment." 18 U.S.C. § 4248(d). However, if the Attorney General is unsuccessful in this effort, he "shall place the person for treatment in a suitable facility, until" a state assumes responsibility or until "the person's condition is such that he is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment." Id.

- 3 -

magazines at that time.  His mother described her son as a loner, who typically had no more than one male friend at a time.

As a teenager, Bolander was suspended from school for selling marijuana, and his parents placed him in a substance abuse program which he failed to complete.  At the age of sixteen, his parents divorced.  His mom moved to California and remarried, and Bolander lived in California with his mother, sister, and step-father.

At the age of nineteen, he enlisted in the Navy and was stationed in San Diego.  Although he refrained from marijuana use while in the Navy, he continued to abuse alcohol.  He was referred to a Navy psychologist after pedophilic literature was found in his foot locker.  Bolander received approximately six counseling sessions over the course of six months and was discharged from treatment after he was transferred to a new duty station.

After his honorable discharge in late 1985 or early 1986, Bolander continued to abuse alcohol.[2]  At the same time, he became preoccupied with his sexual urges and desires for young boys, and he began to collect child pornographic films and pictures by contacting a distributor of such material.  Bolander

_____

[2] In May 1986, Bolander was convicted of driving while under the influence of alcohol (DUI).  He was fined $675 and sentenced to time-served (two days).

began to visit arcades and other places where young boys were present, which would enable him to befriend a potential victim.

In December 1988, at the age of twenty-four, Bolander was charged with numerous sexual offenses in San Diego County (California) Superior Court. He pled guilty to one count of engaging in a lewd and lascivious act with a child under the age of fourteen. The California state court records indicate that Bolander molested an eleven-year old boy over a six-month period at his residence and place of employment. Such molestation involved both oral and anal sex, and Bolander often videotaped and took pictures of these encounters. Bolander kept the videos and pictures of these encounters, along with a host of other child pornographic material he had obtained, at his residence. In April 1989, he was sentenced to six years' imprisonment.

While he was incarcerated in the California Department of Corrections, Bolander was transferred on April 12, 1990 to the Sex Offender Treatment and Evaluation Project at the Atascadero State Hospital (ASH). During his treatment, he expressed rationalizations for his illicit behaviors and his "'philosophy'" about consensual relationships with young boys. (J.A. 494). He stated that boys as young as nine-years old "'know what homosexuality is and know what they are doing.'" (J.A. 494). During his time at ASH, Bolander stole a substantial amount of pornographic stimulus material from the

program (in total, twenty-two magazines, 297 loose pictures, six 35 mm black and white slides, two booklets, and two flyers).  He was arrested on June 6, 1991, but the state prosecutors declined to prosecute the case.  Bolander was paroled in May 1992 after serving a little more than three years.[3]

While on parole, Bolander was required to complete outpatient sex offender therapy.  Upon completion, the program facilitator opined that Bolander was in need of long-term treatment, that his problem had not been fully resolved, and that there was continued risk for relapse.  Reportedly, Bolander became angry and agitated when discussing the course of his treatment.  Such conduct prompted his parole officer to search his residence.  There the parole officer discovered computer disks that contained child pornography, letters indicating how to import and export child pornography, pornographic videos featuring minor males, a copy of the video of Bolander performing sexual acts with the boy who was the victim of the 1988 conviction, and magazines, posters, and books featuring nude boys.

---

[3] Upon release from the California Department of Corrections, Bolander enrolled in college, studying computer programming.  He maintained a 3.37 GPA and completed thirty-six credit hours before withdrawing in the Fall of 1994.

The discovery of this material led to the January 1995 revocation of Bolander's state parole. It also formed the basis of a February 1996 arrest on federal charges for distribution of child pornography and possession of child pornography. Bolander pled guilty to the distribution offense in the United States District Court for the Southern District of California and was sentenced to thirty-seven months' imprisonment.

While in federal prison, Bolander voluntarily participated in the Sex Offender Treatment Program (SOTP) at FCI-Butner. His participation, which began on November 5, 1997, required him to sign an "INFORMED CONSENT FORM." (J.A. 168). In relevant part, the form provides:

> I hereby consent to voluntary participation in the Sex-Offender Treatment Program and agree to adhere to all conditions stipulated in this document. My signature below acknowledges my voluntary participation in the program.
>
> I understand that I may withdraw from treatment at any time. I understand that my confidentiality will be protected at all times, except in cases where there is potential harm to myself or others, or when the security of the correctional institution is threatened. I also understand that the staff of the SOTP and the Federal Bureau of Prisons, Department of Justice, and United States Probation Office may share information regarding my case.

(J.A. 168).

Bolander's participation in the SOTP was hampered by his hostility, argumentativeness, and arrogance. According to psychological records, he displayed the following behaviors

- 7 -

while in treatment: asserting that the victim initiated the sexual contact; maintaining that child molestation was not harmful and that the worst children might suffer was some slight embarrassment; admitting at one point that he would continue to molest boys, if it were not for the legal consequences; declaring that he was the victim of societal persecution for his sexual attraction to children; refusing to complete homework assignments; insisting that therapeutic assignments were of no benefit; and a lack of respect towards treatment staff. Bolander was manipulative during treatment and "absolute[ly] fail[ed] to empathize with his victims." (J.A. 536) (internal quotation marks omitted). As a result, he was expelled from treatment in April 1998 by Dr. Andres Hernandez, the Director of SOTP at that time.[4]

Bolander was released from federal prison in October 1998. While on supervised release, Bolander was indicted on federal child pornography charges in the United States District Court for the Western District of New York. These charges arose after it was discovered that Bolander was exchanging child pornography with a co-defendant that resided in New York. In October 1999,

---

[4] Two reports generated at the SOTP are relevant here. The first is the "Psychosexual Evaluation" dated January 29, 1998; the second is the SOTP "Discharge Summary" dated April 13, 1998. (J.A. 518).

Bolander pled guilty to one count of attempting to receive child pornography and was sentenced to twelve months' imprisonment.

Following his release from federal custody, Bolander's supervised release again was rescinded following a May 2001 search of his residence. The search was prompted by the probation officer's concern that Bolander was living in close proximity to children and that he refused to participate in a recommended treatment program. During the search, it was discovered that Bolander maintained a second phone line through which he obtained unauthorized Internet access. An analysis of Bolander's computer equipment revealed a large cache of child pornography.[5] Most of the child pornography seized involved prepubescent boys, some as young as toddlers.[6] The analysis also

---

[5] The probation officer was informed that Bolander's computer equipment contained "'possibly the largest seizure of child pornography recorded in San Diego County.'" (J.A. 527).

[6] Bolander meticulously categorized his collection of child pornography. He used a ratings system ("G-clothed, non-sexual; PG-clothed, sexual; R-nude, non-sexual (nudist); X-nude, provocative (lewd poses); XX-nude, sexual (erection, masturbation, kissing); and XXX-nude, hardcore sex (sucking, f***ing, licking)), and separated the materials based on the age of the participants ("0-2 years old; 3-5 years old; 6-8 years old, and so on"). (J.A. 504, 527).

revealed that Bolander was participating in Internet news groups and chat rooms that catered to pedophiles.[7]

As a result of the search, more federal charges were brought against Bolander. He was convicted of possession of child pornography in February 2002 and was sentenced to sixty months' imprisonment. This sentence was imposed consecutive to two sentences totaling twenty-six months that Bolander received for supervised release violations.

Bolander's projected release date from prison (with good-time credits factored) was February 9, 2007. On that day, the BOP certified that he was a "sexually dangerous person" pursuant to § 4248(a), automatically staying his release pending an evidentiary hearing. According to the certification, based on psychological assessments of Bolander, he would have serious difficulty refraining from sexually violent conduct or child molestation if released.

The procedural history of this case gets muddled following the filing of the certification, as it took nearly five years to hold the evidentiary hearing. Such delay is relevant to Bolander's due process claim, so we will set forth that relevant procedural history in Part IIIB of the opinion. At the

---

[7] The record reflects that Bolander endorsed pro-pedophilic beliefs. He believes adult-child sexual relations are natural and beneficial.

conclusion of the January 19, 2012 evidentiary hearing, the district court found that the government had proven by clear and convincing evidence that Bolander was a "sexually dangerous person" under the Act.  Bolander noted this timely appeal.

## II

### A

To obtain a commitment order against Bolander, the government was required to establish three elements by clear and convincing evidence.  First, the government was required to establish that Bolander had "engaged or attempted to engage in . . . child molestation" in the past, 18 U.S.C. § 4247(a)(5). Next, the government was required to prove that he currently "suffers from a serious mental illness, abnormality, or disorder," id. § 4247(a)(6).  Finally, the government was required to show that Bolander, as a result of the illness, abnormality, or disorder, "would have serious difficulty in refraining from . . . child molestation if released."  Id.

"[C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir.

2001) (citations, alterations, and internal quotation marks omitted).

On appeal, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Hall, 664 F.3d 456, 462 (4th Cir. 2012). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 573-74.

"When findings are based on determinations regarding the credibility of witnesses," we give "even greater deference to the trial court's findings." Id. at 575. We do this because

> only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them

credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

Id. (citations and alterations omitted). As with lay witnesses, "[e]valuating the credibility of experts and the value of their opinions is [also] a function best committed to the district courts, and one to which appellate courts must defer," and we "should be especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony." Hendricks v. Central Reserve Life Ins. Co., 39 F.3d 507, 513 (4th Cir. 1994).

B

Here, there is no dispute that Bolander engaged in a past act of child molestation, as evidenced by his prior conviction in California state court for engaging in a lewd and lascivious act with a child under the age of fourteen. Thus, the district court correctly found that the government established the first element of sexual dangerousness by clear and convincing

- 13 -

evidence. 18 U.S.C. § 4247(a)(5). There is also no dispute that Bolander presently "suffers from a serious mental illness, abnormality, or disorder." Id. § 4247(a)(6). Bolander was diagnosed by several clinical psychologists as suffering from pedophilia and antisocial personality disorder, and Bolander does not challenge these findings on appeal. Accordingly, the district court correctly found that the government established the second element by clear and convincing evidence.

Thus, the outcome of this appeal largely turns on whether the district court erred in finding that the government had proven, by clear and convincing evidence, that Bolander, as a result of these disorders, "would have serious difficulty in refraining from . . . child molestation if released" from custody. Id. § 4247(a)(6).

The final element of the sexual dangerousness analysis turns on the degree of the person's "volitional impairment," which impacts the person's ability to refrain from acting upon his deviant sexual interests. Kansas v. Hendricks, 521 U.S. 346, 358 (1997); Hall, 664 F.3d at 463. A person's lack of control or inability to control his behavior

> will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual

- 14 -

offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.

Kansas v. Crane, 534 U.S. 407, 413 (2002). "Whether [an] individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." Addington v. Texas, 441 U.S. 418, 429 (1979).

C

Three psychologists evaluated Bolander, prepared expert reports, and testified at the evidentiary hearing, two on behalf of the government, Dr. Christopher North and Dr. Lela Demby, and one on behalf of Bolander, Dr. John Warren.[8] Bolander testified on his own behalf. There were no objections raised to the qualifications of the expert witnesses, and the district court found each expert to be qualified to offer opinions on the issue of Bolander's sexual dangerousness. In reaching their respective opinions, the experts utilized actuarial tests, psychological tests, and their clinical judgment. Of note, each of the psychologists used the reports generated during Bolander's participation in the SOTP at FCI-Butner. Dr. North

---

[8] Dr. North and Dr. Warren are in private practice. Dr. Demby is employed by the BOP.

and Dr. Demby testified that Bolander met the criteria for civil commitment under the Act.  Dr. John Warren declined to offer an opinion on the third element of sexual dangerousness.[9]

1

In forming his opinion, Dr. North considered the voluminous documents referenced in his reports as well as other evidence. Such evidence included information related to Bolander's criminal history, medical history, social history, substance abuse history, institutional adjustment, and other records.  Dr. North also considered the forensic evaluations of Dr. Demby and Dr. Warren.  Dr. North's report was prepared on March 14, 2011 and updated on October 11, 2011.  His testimony at the evidentiary hearing was consistent with the findings and conclusions contained in his report and updated report.

Dr. North determined that Bolander had previously engaged in child molestation.  He also determined that Bolander suffers from pedophilia, male exclusive type.  According to Dr. North,

---

[9] According to Dr. Warren, as a psychologist, it was not his place to offer an opinion on the third element.  He testified the third element was "legal jargon" and an "ultimate issue" created by the courts, and that the third element did not "mesh well with medical or psychological nomenclature."  (J.A. 399). As noted below, Dr. Warren did opine, however, that Bolander had volitional control over his actions, as evidenced by the period of time that had elapsed since Bolander's only molestation offense.

Bolander "'lacks any internal prohibitions against engaging in sexual activity with a child.'" (J.A. 190).

In determining whether Bolander would have serious difficulty refraining from sexually violent conduct, Dr. North used several risk tools that have at least a moderate degree of accuracy. Application of such tools placed Bolander in the comparison group of offenders with a moderate-high to high risk of reoffending.

Dr. North used three actuarial scales aimed mainly at examining static risk factors for sex offender risk assessment: the Static-99R, the Static-2002R, and the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R).[10] Static risk factors typically are historical and do not change. For example, the Static-99R examines ten static risk factors and gives scores for each category.[11] Such tests enabled Dr. North to calculate group recidivism rates of sexual offenders considered by him to be

---

[10] According to Dr. North, the use of multiple "actuarial measures can provide increased confidence in those results." (J.A. 540).

[11] The ten static risk factors examined by the Static-99R are: (1) age at release from instant sex offense; (2) past habitation with a lover for at least two years; (3) convictions for index non-sexual violence; (4) convictions for prior non-sexual violence; (5) prior sex offenses; (6) prior sentencing dates; (7) convictions for non-contact sex offenses; (8) any unrelated victims; (9) any stranger victims; and (10) any male victims.

most analogous to Bolander, and he found a group rate of recidivism of 42% within ten years under Static–99R, 40% within ten years under Static–2002R, and 20% within six years under MnSOST–R.

In addition to these static risk tools, Dr. North also used the Stable-2007, a dynamic risk assessment tool. According to Dr. North, unlike static factors, which typically are historical and do not change, a dynamic risk factor refers to something that has the capacity to change over time, for example with treatment. The presence of dynamic risk factors increases an offender's risk. The following dynamic risk factors were considered by Dr. North: (1) significant social influences; (2) intimacy deficits; (3) sexual self-regulation; (4) cooperation with supervision; and (5) general self-regulation.

Dr. North determined that Bolander's significant social influences were "minimal or primarily negative in that they consist of other men interested in child pornography." (J.A. 552). Dr. North recognized Bolander's close relationship with his mother and step-father, but opined that these relationships never exerted any significant influence over his sexual life or behavior.

Dr. North determined that intimacy deficits were a significant risk factor for Bolander because he had never established or maintained a committed, reciprocal relationship

- 18 -

with a partner that was not abusive. Dr. North noted that Bolander had indicated in the past that he was not interested in developing intimate or sexual relationships with adults. Dr. North also noted Bolander's lack of remorse and that his dependency needs may motivate him to seek contact with other children.

According to Dr. North, Bolander had a "severe problem[]" with sexual self-regulation. Dr. North noted that Bolander had been obsessed with child pornography for many years and had collected child pornography while on probation and parole. He further noted that Bolander "has shown a high degree of sexual preoccupation and is exclusively attracted to prepubescent boys." (J.A. 553).

Dr. North determined that Bolander's lack of cooperation with supervision was problematic. He noted that Bolander's institutional behavior was "fairly good," but was poor while on probation/parole, as demonstrated by his numerous violations while on supervised release. (J.A. 553).

With regard to general self-regulation, Dr. North indicated that Bolander's problem-solving skills were poor because he is unwilling to meaningfully address his pedophilia and obsessive involvement with child pornography. Overall, Dr. North described Bolander's general-self regulation as "poor." (J.A. 553).

Dr. North also examined potentially protective factors.  A protective factor decreases the risk of future sexual offending. The three potentially protective factors examined by Dr. North are: (1) having been in the community for ten years without sexually reoffending; (2) having less than fifteen years left to live due to illness or physical conditions that significantly decrease the motivation and/or ability to sexually reoffend; and (3) very advanced age.  Dr. North opined that none of these factors were particularly mitigating for Bolander.  Bolander had no medical problems that would serve to decrease his ability or motivation to commit a new sexual offense.  Although it had been more ten years since Bolander's last hands-on conviction, Dr. North noted that Bolander's obsession with child pornography placed him in positions where there was considerable risk to children.  Dr. North further noted that Bolander chose to live close to children, an act which placed him at high risk of reoffending.  He also noted that Bolander's total time in the community since his last hands-on conviction was limited, and during this time Bolander was under supervision, which made it more difficult for him to make contact with a child.

In the "SUMMARY" and "CONCLUSION" sections of his March 14, 2011 report, Dr. North stated:

> Bolander is a 47-year-old pedophile who is exclusively attracted to boys.  He was convicted of molesting an 11-year-old boy in California in 1989 and sentenced to

six years in prison.  Since then he has obsessively collected child pornography despite repeated arrests and returns to custody for this behavior.  His pedophilia is ego-syntonic meaning he accepts it and is not distressed by his sexual attraction to boys. He believes it is society that has the problem and told Dr. MacLaren in 1989 that boys over the age nine or ten "know what homosexuality is and know what they are doing."  Mr. Bolander is attracted to boys between the ages of 6 and 12.

The critical issue in this case is Mr. Bolander's risk of committing a new "hands-on" sex offense.  Although he obtained moderate to high scores on the actuarial instruments used to assess risk for sexual reoffense, these instruments do not predict the <u>type</u> of sexual offense to be committed and he clearly appears to be more likely to commit a "hands-off" offense (involving pornography) than a "hands-on" crime.  On the other hand, he has not been in the community for very long since paroling for his molest offense in 1992 and was supervised closely enough that it was probably difficult for him to establish contact with a child. It was easier for him to believe that he could escape detection by collecting pornography.  . . .  He is 47 years old and appears to be in good health, and barring any unforeseen circumstances, his opportunity time (at risk) could be 30 to 40 years.  Given the lack of any internal prohibitions against sexual activity with a child and Mr. Bolander's intense sexual interest in male children, it is this evaluator's opinion that eventually Mr. Bolander is indeed likely to commit a new "hands-on" sex offense with a prepubescent boy.  His pedophilia will cause him serious difficulty in refraining from child molestation if released to the community.

* * *

Based on the above information, it is my opinion that Mikel Bolander <u>does meet</u> the criteria as a Sexually Dangerous Person.

(J.A. 554-55).

Following the preparation of this report, Dr. North met with Bolander.  During the interview, Bolander clarified some

- 21 -

minor factual inaccuracies in Dr. North's report. He also stressed to Dr. North that he was trying to increase his sexual arousal to adults, had not masturbated in five to six years, knew child molestation and possession of child pornography were wrong, felt remorse for victims, and was "truly motivated to never molest again." (J.A. 580). Although Dr. North noted that Bolander "presented well," he was skeptical of Bolander's claims, noting that he had made reformation claims in the past yet still went on to amass large collections of child pornography. Ultimately, Dr. North concluded that Bolander's "exclusive sexual interest in prepubescent boys is so strong that he will have serious difficulty refraining from child molestation if released to the community." (J.A. 581).

2

Dr. Demby, a BOP forensic psychologist, also testified at the evidentiary hearing. Her testimony was consistent with the findings and conclusions contained in her report dated March 9, 2011.

In her report, Dr. Demby examined Bolander's developmental history, relationship history, education history, employment history, substance abuse history, non-sexual criminal history, sexual criminal history, psychiatric/psychological history, mental health history, and medical history. Because Bolander refused to participate in a clinical evaluation with Dr. Demby,

she was not able to interview Bolander as part of her evaluation.

Dr. Demby made the following diagnoses: "(1) Pedophilia, Sexually Attracted to Males, Exclusive and (2) Schizoid Personality Disorder." (J.A. 195). Dr. Demby explained the bases for each of her diagnoses and opined that each qualify as a serious mental illness, abnormality, or disorder. Further, she concluded that, as a result of these diagnoses, Bolander would have serious difficulty in refraining from sexually violent conduct.

With regard to the pedophilia diagnosis, Dr. Demby explained that Bolander meets the diagnosis based, in part, on his recurrent and intense sexually arousing fantasies, and sexual urges and actions involving prepubescent males. Further, she opined that the evidence shows he constructed his lifestyle to obtain maximum exposure to young children and child pornography, even while on supervised release. He engaged in sophisticated techniques to avoid financial disclosure of his activities to his probation officers. She specifically noted that treatment providers have reported that he has demonstrated little guilt or remorse for his crimes, except for self-focused regret concerning the negative consequences he has endured. In spite of efforts at treatment, he has continued to engage in sexually inappropriate attraction to young boys even when the

- 23 -

threat of detection and sanctions are high, as indicated by his theft of sexual stimuli at ASH and his numerous revocations of supervised release.

Dr. Demby utilized the Static-99R to assess Bolander's risk of sexual reoffense. She found a group rate of recidivism of 49% within ten years under this test.

In considering the applicability of dynamic risk factors, Dr. Demby utilized an empirically guided risk assessment tool called the "SVR-20." (J.A. 511). The SVR-20 does not yield quantitative predictions in the same way that the Static-99 and Static-2002R do. Instead, the scorer evaluates twenty factors weighing them in their totality to form an overall opinion about whether an offender will likely reoffend.[12] Dr. Demby concluded that Bolander had eight factors that were considered to

_____

[12] The twenty factors include: (1) the presence of sexual deviance; (2) whether the respondent had been a victim of child abuse; (3) psychopathy traits; (4) the presence of a major mental illness; (5) endorsement of suicidal or homicidal ideation; (6) a history of substance abuse; (7) the presence of a stable relationship; (8) a stable employment history; (9) a history of nonsexual violent offenses; (10) a history of nonviolent and nonsexual offenses; (11) past supervision failure; (12) a high density of sexual offenses within a relatively short period; (13) multiple types of sexual offenses; (14) causing victims physical harm; (15) the use of weapons or threats; (16) the presence of escalating sexual offenses or severity of sexual offenses; (17) extreme minimization or denial of responsibility; (18) attitudes that support or condone sexual offenses; (19) negative attitudes towards intervention; and (20) release and relapse prevention plans.

exacerbate his risk of reoffending (Factors (1), (7), (10), (11) (13), (17), (18), and (19)), eleven that were considered not to exacerbate his risk of reoffending (Factors (2), (3), (4), (5), (6) (8), (9), (12), (14), (15), and (16)), and one factor (Factor 20) that was not assessed because Bolander refused to be interviewed. After weighing the number and nature of the exacerbating factors, Dr. Demby concluded that Bolander's risk of future sexual violence was "High" on the SVR-20. (J.A. 515).

With regard to the factors in exacerbation, Dr. Demby emphasized Bolander's sexual deviance, as evidenced by his history of sexual arousal to young children and his lack of an interest in engaging in a sexual or intimate relationship with an adult. She also emphasized that Bolander had no stable relationships that would provide him support upon release, as evidenced by his history as a loner and his desire to "continue [life] in this vein." (J.A. 513). Dr. Demby noted as exacerbating Bolander's history of non-violent, non-sexual offenses, which included juvenile delinquency, substance abuse, and a DUI conviction. Also exacerbating were Bolander's past supervision failures, namely, his "violat[ion of] supervision on two occasions by sexually reoffending." (J.A. 514). Dr. Demby noted that Bolander had multiple types of offenses involving child abuse/pornography (molestation, possession and distribution of pornography, and attempting to receive child

pornography through the mail) and that Bolander continued to minimize and deny responsibility for his conduct. Dr. Demby also examined Bolander's long history of supporting a right to adult-child relationships:

> "[C]opious treatment records indicate that he believes that he is entitled to sex, and that he is a preferential, fixated, same-sex pedophile. When told that he needed to recondition his pedophilic urges, he has sabotaged treatment, stolen sexual stimuli, and twice refused to participate in arousal reconditioning. He has stated several times the he would continue to molest boys if he thought he could get away with it.

(J.A. 514). Relying on much of the same evidence, Dr. Demby concluded that Bolander harbored a negative attitude toward intervention.

With regard to the factors that did not exacerbate, Dr. Demby noted that Bolander was not a victim of sexual abuse. She noted that, although Bolander displayed signs of psychopathy, such signs were insignificant to find the psychopathy factor exacerbating. Dr. Demby found no presence of a major mental illness, suicidal or homicidal ideation, or a recent history of substance abuse. She noted Bolander's ability to maintain steady employment and that he had no history of non-violent sexual offenses. Dr. Demby also noted that Bolander had not committed sexual offenses frequently in a short period of time, had not physically injured his victims, and used no weapons or threats during the commission of his offenses. Finally, Dr.

Demby noted that Bolander's sexual offenses did not escalate or become more severe over time.

At the conclusion of her report, Dr. Demby gave a "Summary of Risk Assessment & Prognosis" and an "Opinion on the Issue of Sexual Dangerousness." (J.A. 516-17). The report states:

> Mr. Bolander is a 47-year-old, life-long pedophile and child abuser whose past history and high scores on the Static-99R and the SVR-20 indicate a very high probability that his past patterns of sexually abusing children will continue. His paraphilic sexual attraction to children began in his early adolescence, and has led to numerous charges, convictions, incarceration, and revocations of his release. He has unsuccessfully attempted therapy to address his sexual attraction to young boys. He continues to endorse sexually deviant beliefs, and minimizes his responsibility by blaming his child victim for initiating the sexual molestation. He has behaved in sexually inappropriate ways even when the risk of detection was high, as seen in his residential proximity to children, and downloading and distribution of a massive amount of child pornography, while on supervised release. His pervasive personality style of exploiting his environment displays itself in his repeated violations of social norms, expectations, and rules, including the sexual coercion of those most vulnerable around him. Cumulatively, his overall history, criminal record, offense characteristics, lifestyle choices, personality patterns, sexual relapses, and treatment failures indicate an extremely high risk of future sexual reoffense. His prognosis at this time is very poor.

> \* \* \*

> It is highly likely that Mr. Bolander will continue the sexual abuse of young children, particularly prepubescent boys. His diagnosis of Pedophilia and Schizoid Personality Disorder are chronic, pervasive, and deeply engrained. He has continued to sexually reoffend after receiving sex offender treatment and

- 27 -

intensive community supervision.  He has stated and demonstrated his intent to continue to indulge his pedophilic sexual deviance.  It is the opinion of this evaluator that Mr. Bolander is a person suffering from a serious mental illness, abnormality, or disorder, as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation.

(J.A. 516-17).

3

Dr. Warren testified at the evidentiary hearing as Bolander's expert witness.  His testimony was consistent with the findings and conclusions contained in his report dated July 25, 2011. Dr. Warren opined that Bolander met the first two elements necessary for sexual dangerousness.  As part of his evaluation, Dr. Warren used the Static-99R test.  He calculated Bolander's group rate of recidivism to be 14.7% within five years.  Dr. Warren also identified six dynamic factors, four lessening the recidivism risk (significant social influences, sexual self-regulation, general self-regulation, and cognitive problem solving skills) and two increasing the risk of recidivism (intimacy deficits and cooperation with supervision). Dr. Warren opined that Bolander had certain strengths that would enable him to function normally in society by maintaining his volitional control.  Dr. Warren noted that Bolander: (1) functioned in an incarcerated setting without significant disciplinary issues; (2) had been able to control his behavior

in terms of hygiene, his activities, and his vocational interests within the facility; (3) had a four-year period of non-contact offending; (4) earlier in life decided to stop marijuana use; (5) earlier in life decided to further his education; and (6) made decisions earlier in life to advance his vocational interests. In the "Summary and Recommendations" section of his report, Dr. Warren states:

> Mikel James Bolander is a 47-year-old, Caucasian male with a history of completion of sentencing for conviction of Possession of Child Pornography. He has a previous conviction for one, sexually-related contact offense and two other child pornography (one possession, one mailing) offenses.
>
> He does not have a mental disorder that [impairs] his volitional ability to control his behavior. He does not have a personality disorder.
>
> Mr. Bolander's risk for sexual re-offending with child pornography offenses is higher than that of contact offending, and overall slightly higher than all sexual offenders taken as a group. However, his risk for all sexual re-offending upon release from incarceration is more likely than not lower than the published recidivism risk of non-sexual offenders released from prison.
>
> Mr. Bolander has a history of gainful and consistent employment. He has interpersonal and technical skills that can be applied to future employment. If released from incarceration Mr. Bolander reported his plan to reside in Las Vegas due to the multiple opportunities for employment . . . and to the proximity of his parents' residence about one and a half hours away.

(J.A. 560-61). As noted above, Dr. Warren did not offer an opinion on the third element of the commitment test, but he did indicate that, whether Bolander was committed or released, he

needed sexuality psychoeducation in the context of a strength based individual and/or group treatment approach, and cognitive behavioral treatment.

D

Bolander also testified at the evidentiary hearing. He described the details of his only hands-on offense and expressed remorse over what had happened. He testified that, around 2004 or 2005, he had a change of heart that caused him to think differently about child molestation. He read numerous psychological journals and books on victim empathy. Bolander testified that he now knows child molestation is "totally wrong," (J.A. 342), and that he had not thought about children in a sexual way in over seven years. He testified he would not molest another child again. He also testified that, for the first time in his life, he has been able to develop close friendships with adults.

E

Dr. Andres Hernandez, who was the Director of SOTP while Bolander was enrolled in the program, testified as a lay witness at the evidentiary hearing. He testified that Bolander's participation in the SOTP was "rather memorable." (J.A. 358). He found "striking" Bolander's "pedophilic drive," his resistance to treatment, and "the degree to which his pedophilic beliefs were so entrenched." (J.A. 358). Dr. Hernandez also

found that Bolander was not in the SOTP to change, but rather to challenge the beliefs of others.

F

At the conclusion of the evidentiary hearing, the district court ruled from the bench. With respect to the third element of the commitment test, the district court stated:

> Respondent [has] continued to commit criminal offenses while on parole or supervised release, . . . Respondent has not successfully completed a sex offender program. Both Doctors Demby and North opined that Respondent would have serious difficulty in refraining from sexual violent conduct or child molestation if released. The Court finds that both doctors are credible and adopts their conclusions as they are well-reasoned and supported by the evidence in this case.

> Both Doctors Demby and North found that, using actuarial instruments, the Respondent is in the moderate to high range. However, [t]he Court believes though these instruments are important, the greater weight should be placed on factors outside the actuarial scheme as indicated in those instruments. These include the areas discussed before, i.e., the relapse, failure to complete the offenders program.

> Respondent believes on his "oath to himself" that it – this will ensure that he does not reoffend. This is certainly a good start, but his lack of completion of a sex offender program leaves him without the tools to accomplish his oath. Respondent's self-help by reading books and developing victim empathy is good, but [t]he Court finds that this is not a substitute for a sex offender program, and Respondent has failed to seriously complete a program.

> The Court finds that Respondent places himself in a slippery slope situation, and it appears that that's a word that comes up very often in these cases. It's defined by the way his conduct was while he was released into the community and has not developed the necessary skills to remain free if released.

The Court finds that Respondent talks the talk, but, again, does not have the skills to remain crime free without meaningful mainstream treatment. And I say mainstream treatment as opposed to Dr. Warren, who I'm sure was very knowledgeable and so forth, but suggested treatment that was not that mainstream and not in the sense that it was not good treatment. But it was certainly an unreasonable expectation to have that kind of one-on-one kind of treatment while he's incarcerated, though he does get one-on-one . . . when needed, and it would be unrealistic to release him until such time as he has this treatment and develops the skills necessary so that he does not reoffend.

For these reasons, [t]he Court finds that Respondent is sexually dangerous and that he suffers from a serious mental illness, abnormality or disorder and as a result of this, he would have serious difficulty in refraining from sexually violent conduct or child molestation if he was released.

(J.A. 425-27).

G

Bolander maintains that the district court erred in concluding that he would have serious difficulty refraining from future acts of child molestation. Reduced to its essence, Bolander posits that the district court did not adequately take into account his time in the community without a hands-on offense.

"Serious difficulty" refers to the degree of the person's volitional impairment which impacts the person's ability to refrain from acting upon his deviant sexual interests. Hall, 664 F.3d at 463. Here, there were facts in evidence, if credited by the district court, that would support a finding

- 32 -

that Bolander would have serious difficulty refraining from acts of child molestation if he was released because of his pedophilia. The record is replete with examples of Bolander's inability to refrain from engaging in acts involving child pornography. Whether it was his stealing of pornographic materials from the treatment lab while at ASH or his repeated possession of child pornography while on supervised release, the record is clear that he has serious difficulty refraining from trying to find an appropriate outlet for his sexual desires. He has an admitted attraction to adolescent males between the ages of six and twelve and has not participated in any treatment which would assist him in managing these volitional control issues. Moreover, the intense nature of Bolander's obsession with child pornography, in particular his large cache of materials and the meticulous manner in which he kept such materials, understandably was a concern of Dr. North and Dr. Demby. In view of this evidence, it was reasonable for the district court to find by clear and convincing evidence that Bolander's pedophilia would cause him to have serious difficulty refraining from acts of child molestation.

Bolander's argument that the district court did not adequately consider the fact that he had no hands-on offense in over twenty years misses the mark. As noted by Dr. North, the absence of a more recent hands-on offense has more to do with

the strict supervision placed on Bolander than a true change of heart. Considering Dr. North's reasonable explanation, the district court was at liberty to reject Bolander's no hands-on offense argument. Anderson, 470 U.S. at 573-75. Along a similar vein, the district court was free to reject Bolander's testimony that he is a reformed man. The success of his rehabilitation efforts largely are suspect considering he is doing them on his own.

In sum, as we noted in Hall, the "question of whether a person is 'sexually dangerous' is 'by no means an easy one,' and 'there is no crystal ball that an examining expert or court might consult to predict conclusively whether a past offender will recidivate.'" 664 F.3d at 467 (quoting United States v. Shields, 649 F.3d 78, 89 (1st Cir. 2011), cert. denied, 132 S. Ct. 1586 (2012)). In this case, the district court carefully considered the evidence before it, and its factual findings represent a permissible and reasonable interpretation of the evidence presented at the hearing. Because we are not "left with the definite and firm conviction that a mistake has been committed" by the district court, United States Gypsum Co., 333 U.S. at 395, we cannot say that the district court clearly erred in finding, by clear and convincing evidence, that Bolander is sexually dangerous within the meaning of the Act.

III

Having concluded that the district court did not err when it found by clear and convincing evidence that the government met each of the three elements for sexual dangerousness, we turn to Bolander's remaining arguments challenging his civil commitment.

A

Bolander contends that § 4248 deprives him of equal protection under the Fifth and Fourteenth Amendments. In pressing this argument, Bolander acknowledges that this argument is foreclosed by our decision in United States v. Timms, 664 F.3d 436 (4th Cir.), cert. denied, 133 S. Ct. 189 (2012). In Timms, we held that § 4248 does not violate the Equal Protection Clause because individuals in BOP custody are not similarly situated to individuals who are not in BOP custody. Id. at 449. In so holding, we emphasized that "Congress rationally limited § 4248's scope to sexually dangerous persons within BOP custody based on Congress' limited police power and the federal interest in protecting the public from reasonably foreseeable harm from such persons." Id. Because Timms forecloses Bolander's equal protection argument, we reject it.

Bolander also contends that § 4248 levies an unconstitutional criminal punishment. This argument also is foreclosed by our decision in Timms. Id. at 455. In Timms, we

clarified any ambiguity concerning this question created by our decision in United States v. Comstock, 627 F.3d 513 (4th Cir. 2010), cert. denied, 131 S. Ct. 3026 (2011) (Comstock II).  Id. We further noted that § 4248's use of the clear and convincing evidence standard rather than the proof beyond a reasonable doubt standard rendered the overall design of § 4248 civil in nature.  Id.[13]

B

Second, Bolander argues that his due process rights were violated because the January 12, 2009 evidentiary hearing took place almost five years after he was due to be released (February 9, 2007).  This argument has no merit.

In Timms, we noted that the "civil commitment process clearly impacts an individual's due process rights."  Id. at 450.  "Because an adverse outcome in a commitment hearing results in a massive curtailment of a person's liberty, whether the respondent is already a prisoner or not, the Supreme Court has held that due process . . . affords respondents in [civil commitment] proceedings several procedural protections."  Id.

---

[13] To the extent Bolander challenges the actual conditions of his confinement under § 4248, this civil/criminal argument similarly is foreclosed by Timms.  664 F.3d at 455.  That is not to say, however, that Bolander is without a remedy.  As the government concedes, Bolander may challenge the conditions of his confinement in an action under Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

(citation and internal quotation marks omitted). "Once it is determined that due process applies, the question remains what process is due." Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

In assessing what due process is due in the civil commitment context, we analyze "'the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken.'" Timms, 664 F.3d at 451 (quoting FDIC v. Mallen, 486 U.S. 230, 242 (1988). This test "evaluate[s] the sufficiency of particular procedures, while also avoiding the establishment of rigid rules due to the recognition that the requirements of due process are flexible and cal[l] for such procedural protections as the particular situation demands." Id. (citations and internal quotation marks omitted).

Without question, Bolander possesses a substantial private interest affected by the certification under § 4248. His interest in liberty and freedom from physical restraint are at stake. Thus, the private liberty interest factor weighs in his favor. Id. ("The statute also places no express outer limit on how long that stay may remain in force or when the court must conduct the commitment hearing. During that period of time, however short or long it may be, an individual's liberty is

restrained; thus, the statute implicates a substantial interest."). Moreover, the likelihood that the interim decision may have been mistaken factor favors Bolander. Id. at 452 (noting that the interim decision factor weighed in favor of the respondent because § 4248 requires no specific steps prior to certifying someone, other than that signatory's determination that the person meets the criteria for being sexually dangerous, § 4248 requires no pre-certification hearing or other initial adversarial review, and the risk of improper certification was "apparent from the parties' representation that of the approximately 130 individuals certified under § 4248, the Government subsequently dismissed almost two dozen certifications because it subsequently determined the individual did not satisfy the criteria").

However, like the respondent in Timms, Bolander's due process claim fails because the last inquiry, the government's interest and the justification offered by the government for the delay, weighs decidedly in the government's favor. To resolve this last inquiry, we must first turn to the convoluted procedural history of the case.

Following the implementation of the Act, the government began to certify individuals as sexually dangerous under the Act. Such action led to a host of constitutional challenges in the United States District Court for the Eastern District of

North Carolina, the district in which nearly all § 4248 actions were filed.

On February 9, 2007, the government filed a certificate in the United States District Court for the Eastern District of North Carolina seeking to commit Bolander as a sexually dangerous person under § 4248. At the time, Bolander was about to be released from BOP custody, but his release was stayed because of the government's § 4248 certification. On the same day, Judge Britt, the senior district judge assigned to Bolander's case, appointed the Federal Public Defender to represent Bolander and set a hearing date of September 4, 2007. On August 15, 2007, Bolander filed a motion to continue the hearing, which the district court granted.

On September 7, 2007, Judge Britt issued his ruling in United States v. Comstock, 507 F. Supp. 2d 522 (E.D.N.C. 2007). In that case, the government certified five respondents in its custody as sexually dangerous under § 4248 and requested evidentiary hearings. Id. at 526-27. However, no evidentiary hearings were held. Id. at 559-60. Instead, Judge Britt granted the respondents' motions to dismiss as a matter of law, on the ground that § 4248 exceeded the scope of Congress's authority under the United States Constitution to enact legislation and, in the alternative, on the ground that the statute facially violated the respondents' due process rights.

Id. at 526, 559. However, Judge Britt stayed the release of the respondents from custody pending an appeal from his decision. Id. at 560.

On September 11, 2007, Bolander filed a motion to dismiss the certification on the basis of Judge Britt's decision in Comstock. In response, on September 20, 2007, the government moved to stay its response to Bolander's motion and other similar motions pending in numerous certification cases in the Eastern District of North Carolina. On January 8, 2008, the district court granted the government's motion to stay its response to Bolander's motion and other similar motions pending.

On January 8, 2009, we affirmed the dismissal of the § 4248 certifications in United States v. Comstock, 551 F.3d 274 (4th Cir. 2009), rev'd, 130 S. Ct. 1949 (2010) (Comstock I), holding that Congress lacked constitutional authority to enact the statute. Id. at 276. The following day, Bolander filed a motion for release from custody, relying on our decision in Comstock I. While this motion was pending, the government petitioned for a writ of certiorari. The United States Supreme Court granted the petition on June 22, 2009. United States v. Comstock, 129 S. Ct. 2828 (2009). Because the Supreme Court granted the petition, the district court declined to rule on Bolander's motion for release.

In May 2010, the United States Supreme Court issued its opinion in United States v. Comstock, reversing our decision that § 4248 was unconstitutional, and holding that Congress properly enacted the statute pursuant to the Necessary and Proper Clause of the United States Constitution. 130 S. Ct. 1949, 1954 (2010). The Supreme Court remanded the case to this court to consider the additional grounds presented, but not decided, in Comstock I, and upon which the district court in that case had held that § 4248 was unconstitutional. Id. at 1955, 1965.

Following the Supreme Court's decision in Comstock, on June 6, 2010, the district court denied, under the authority of Comstock, all pending motions for release in the § 4248 cases before it and lifted any stay or abeyance ordered in those cases. The district court directed Bolander to proceed with additional constitutional challenges or an evidentiary hearing as he saw fit.

On June 22, 2010, Bolander filed a motion to dismiss the certification, relying on the constitutional claims left unresolved by the Supreme Court's decision in Comstock. In the motion, Bolander stated that he was not requesting an evidentiary hearing "[a]t this time." (J.A. 67).

On August 4, 2010, the then-Chief Judge for the Eastern District of North Carolina, Chief Judge Louise W. Flanagan,

issued a standing order related to the processing of § 4248 commitment actions in that district. The order's terms included the following provision regarding motions for hearings:

> Until such time as the final determination by an appellate court of "any claim that the statute or its application denies equal protection of the laws, procedural or substantive due process, or any other rights guaranteed by the Constitution[,]" if an individual respondent would like to proceed with the litigation of the government's petition for his commitment, counsel for the respondent shall inform the court of the respondent's desire to proceed with a hearing by filing a motion for a hearing. Such motion shall be filed . . . as soon as practicable after the respondent informs his counsel of his desire to litigate the commitment petition.

Aug. 4, 2010 Standing Order of the Court, § 3(b). On August 6, 2010, Bolander's case was reassigned to Chief Judge Flanagan.

We heard oral argument in the remanded case in September 2010. In our December 10, 2010 decision in Comstock II, we reversed the district court's judgment concerning the burden of proof under § 4248. We held that the statute did not violate the Due Process Clause by requiring a court to find by clear and convincing evidence (rather than proof beyond a reasonable doubt) that the individual has engaged or attempted to engage in sexual violence or child molestation and is sexually dangerous to others. 627 F.3d at 519-25. Consequently, the case was remanded to the district court with instructions to proceed to the merits on the pending commitment actions. Id. at 525.

On December 15, 2010, Bolander filed a motion for substitution of counsel, asserting that his relationship with his public defender had deteriorated to the point where he felt the public defender could not adequately represent him. On January 14, 2011, the Office of the Federal Public Defender moved to withdraw and have new counsel appointed. On February 16, 2011, the motion for substitution of counsel and the motion to withdraw were granted.

On January 28, 2011, the district court entered a scheduling order directing the government to provide initial disclosures. The government's initial disclosures were due by April 4, 2011, and Bolander's were due by June 6, 2011. After the exchange of initial disclosures, the parties had an additional sixty days within which to conclude discovery.

On March 25, 2011, the district court denied Bolander's June 22, 2010 motion to dismiss the certification, finding no grounds in which to grant the motion. On May 31, 2011, Bolander moved for an extension of time until July 18, 2011 to provide his initial disclosure. The motion was granted. On July 14, 2011, Bolander sought to extend the deadline until September 16, 2011, and the district court granted this request as well.

On September 16, 2011, the district court set an evidentiary hearing date of November 28, 2011. On September 23, 2011, Bolander requested a continuance of the hearing date until

the week of December 20, 2011. The motion for continuance was granted, but the district court set the evidentiary hearing for January 12, 2012.

In this case, the record reflects that the justification offered by the government for the delay in holding Bolander's § 4248 hearing satisfies the requirements of due process. The initial date for Bolander's evidentiary hearing was September 4, 2007. However, prior to the hearing date, Bolander moved for a continuance. Before a new hearing date was set, the district court issued its ruling in Comstock. From the time the district court issued this decision, the government cannot be held responsible for failing to push for an evidentiary hearing. As we noted in Timms, the government cannot be blamed "for agreeing to the abeyance in light of the heavy cost of pursuing hearings on the merits when § 4248 proceedings remained under a cloud of constitutional uncertainty. There is simply no basis for the validity of the argument that the Government should have, at its own initiative, pressed for a commitment hearing under these circumstances." 664 F.3d at 453.

After the Supreme Court issued its decision in Comstock, the constitutionality of § 4248 still was unsettled. Notwithstanding this uncertainty, Bolander did not seek an evidentiary hearing. Rather, in his June 22, 2010 motion, he specifically stated he was not requesting a hearing. His case

remained dormant, mainly because Comstock II was pending in this court, until the end of 2010 when he requested a substitution of counsel. The granting of this request further delayed the proceedings, with no fault attributable to the government. After substitute counsel was appointed, Bolander sought two extensions of time in which to file initial disclosures and requested a continuance after the November 28, 2011 hearing date was set. After this request for continuance was granted, the district court held the evidentiary hearing less than two months after the November 28 date.

In sum, the government's lawful exercise of its authority under § 4248 is not to blame for the delay in holding Bolander's evidentiary hearing and did not deny him due process. Accordingly, the district court did not err when it concluded that Bolander's due process rights were not violated in this case.

C

As noted above, Bolander participated in the SOTP at FCI-Butner from November 1997 until April 1998. During his participation in the program, two relevant reports were generated. The first is titled "Psychosexual Evaluation" and dated January 29, 1998; the second is titled "Discharge Summary" and dated April 13, 1998. (J.A. 518). In preparing his expert report, Dr. North (as well as Dr. Warren) referred to these

reports.  Prior to the evidentiary hearing, on December 6, 2011, Bolander moved in limine to exclude any and all evidence relating to the personal disclosures he made as part of the SOTP, contending they were privileged under a psychotherapist-patient privilege.  The district court denied the motion, and Bolander challenges this ruling before this court.

The United States Supreme Court has recognized a psychotherapist-patient privilege, finding that psychotherapy serves "a public good of transcendent importance."  Jaffee v. Redmond, 518 U.S. 1, 11 (1996).  In Jaffee, the Court held that confidential communications between a patient and a licensed social worker, during the course of diagnosis or treatment, are privileged and protected from discovery.  Id. at 15-16.

The Court looked to Rule 501 of the Federal Rules of Evidence, which authorizes federal courts to define new privileges by interpreting "principles of common law . . . in the light of reason and experience." Fed. R. Evid. 501. Reason and experience, as well as the fact that all fifty states plus the District of Columbia had some version of the psychotherapist-patient privilege, led the Court to conclude that the psychotherapist-patient privilege exists under Rule 501.  Jaffee, 518 U.S. at 10-12.

In Jaffee, the first officer to respond to a call involving a fight shot and killed Ricky Allen.  Id. at 10.  Officer

Redmond shot Allen because she believed he was about to stab another man with a butcher knife. Id. at 4. As a result of this incident, Officer Redmond participated in approximately fifty counseling sessions with a state-licensed social worker. Id. at 5. Jaffee, the administrator of Allen's estate, brought a § 1983 excessive force claim against the Officer Redmond. Id. Jaffee requested production of the social worker's notes from her counseling sessions with Officer Redmond in order to use these notes in cross-examination. Id. Although Officer Redmond and the social worker asserted the psychotherapist-patient privilege and "vigorously resisted the discovery," the district court ordered that the notes be disclosed. Id. After Officer Redmond and the social worker refused discovery of the notes, the district court instructed the jury that they could presume the contents of the notes to be unfavorable to Officer Redmond. Id. at 5-6. Jaffee was awarded a total judgment of $545,000 against Officer Redmond. Id. at 6.

The Seventh Circuit reversed and remanded for a new trial, concluding that Rule 501 compelled recognition of a psychotherapist-patient privilege. Id. According to the Seventh Circuit, the privilege would not apply if "in the interests of justice, the evidentiary need for the disclosure of the contents of a patient's counseling sessions outweighs [the] patient's privacy interests." Id. at 7 (internal quotation

- 47 -

marks omitted).  The Seventh Circuit determined that Officer Redmond's privacy interest outweighed Jaffee's evidentiary need for the notes.  Id.

On appeal to the Supreme Court, the Court affirmed the Seventh Circuit, holding that protecting confidential communications between a psychotherapist and patient promotes a critical interest and outweighs the need for probative evidence. Id. at 16-18.  However, the Court rejected the Seventh Circuit's balancing test.  Id. at 17.  The Court reasoned that "[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege."  Id. at 17.  The Supreme Court feared that use of a balancing test would frustrate the aim of the privilege by making its application uncertain.  Id. at 18.

The Court's decision in Jaffee is premised on the notion that "[t]he mental health of our citizenry, no less than its physical health, is a public good of transcendent importance." Id. at 11.  The Court recognized that the psychotherapist-patient relationship is "rooted in the imperative need for confidence and trust" wherein the patient willingly makes "frank and complete disclosure of facts, emotions, memories, and fears."  Id. at 10 (internal quotation marks omitted).  Thus,

"the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment." Id. Without the privilege, the Court observed, "confidential conversations between psychotherapists and their patients would surely be chilled, particularly when it is obvious that the circumstances that give rise to the need for treatment will probably result in litigation." Id. at 11-12.

The Jaffee Court did not outline the contours of the psychotherapist-patient privilege, because it was "neither necessary nor feasible to delineate its full contours in a way that would govern all conceivable future questions in this area." Id. at 18 (citation and internal quotation marks omitted). In a footnote, the Court noted that the patient may waive this privilege, like other testimonial privileges, but did not further address the issue of waiver. Id. at 15 n.14.

The Court in Jaffee also noted that the privilege would yield under some circumstances. Id. at 18 n.19. In a footnote, the Court stated "[w]e do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist." Id.

Like all testimonial or evidentiary privileges, the psychotherapist-patient privilege must be strictly construed. United States v. Squillacote, 221 F.3d 542, 560 (4th Cir. 2000)

(spousal privilege). In the case of another evidentiary privilege, the attorney-client privilege, we have recognized that the holder of it may waive the privilege either expressly or impliedly by a voluntary disclosure to a third party. Hawkins v. Stables, 148 F.3d 379, 384 n.4 (4th Cir. 1998) (attorney-client privilege). An implied waiver waives the privilege not only as to the specific information disclosed, but also as to the subject matter of the disclosure. Id. The burden rests on the person invoking the privilege to demonstrate its applicability, including the absence of any waiver of it. United States v. Jones, 696 F.2d 1069, 1072 (4th Cir. 1982).

In this case, the government argues that a person subject to civil commitment does not have a constitutionally protected expectation of privacy in prison treatment records when the government has a legitimate interest in access to them. This argument is premised on Footnote 19 in Jaffee, where the Court stated that the psychotherapist-patient privilege would "give way" in certain situations. Jaffee, 518 U.S. at 18 n.19. Alternatively, the government argues that Bolander waived any psychotherapist-patient privilege he may have enjoyed. Because we agree with the government that Bolander waived any psychotherapist-patient privilege he may have enjoyed, we decline to address the government's argument premised on Footnote 19 in Jaffee. Accordingly, we express no opinion on

whether the disclosures made by Bolander during his participation in the SOTP are protected communications under the psychotherapist-patient privilege.

A patient may waive the psychotherapist—patient privilege by knowingly and voluntarily relinquishing it. United States v. Hayes, 227 F.3d 578, 586 (6th Cir. 2000). A waiver may occur when the substance of therapy sessions is disclosed to unrelated third parties, see id. (noting that "a patient can waive the protections of the psychotherapist/patient privilege by disclosing the substance of therapy sessions to unrelated third parties"), or when the privilege is not properly asserted during testimony. See Hawkins, 148 F.3d at 384 ("By answering the question as [the defendant] did, [the defendant] both waived her [attorney-client] privilege and provided probative evidence [on the subject matter].").

In this case, Bolander willingly provided the SOTP materials to his own expert, Dr. Warren. In the report, Dr. Warren acknowledged that he received and reviewed the materials Bolander claims are privileged. Bolander did not assert the psychotherapist—patient privilege prior to his disclosure to Dr. Warren. Rather, he waited until approximately one month prior to the evidentiary hearing to do so, even though the case had been pending in the district court for quite some time. By failing to timely assert the psychotherapist—patient privilege,

- 51 -

Bolander waived whatever privilege he may have had.  Put another way, it was incumbent upon Bolander to assert the psychotherapist—patient privilege in a timely fashion, rather than waiting until the eleventh hour to do so.  See United States v. Ary, 518 F.3d 775, 784-85 (10th Cir. 2008) (holding that failure to timely assert attorney-client privilege constitutes waiver); United States v. White, 970 F.2d 328, 334-35 (7th Cir. 1992) (same).  Moreover, to the extent Bolander claims a privilege in his communications with Dr. Warren, we reject this argument as well.  Dr. Warren was not being sought for treatment, but rather to evaluate Bolander's mental condition.  And as the Supreme Court in Jaffee made clear, the privilege only extends to those psychotherapists who are being consulted for diagnosis and treatment, not under other circumstances.  501 U.S. at 15.

Bolander also failed to assert the psychotherapist—patient privilege during his October 4, 2011 deposition.  During that deposition, Bolander was asked questions about his participation in the SOTP.  He did not assert any privilege with respect to the information he provided in the SOTP, including the documents generated by the program.  Instead, Bolander openly discussed his participation in the SOTP, including the numerous admissions he made during that program.  By answering questions without

asserting the psychotherapist—patient privilege, Bolander waived

any privilege he may have enjoyed.  <u>Hawkins</u>, 148 F.3d at 384.

Bolander suggests that a defendant in need of psychotherapy

treatment will be forced to make the unenviable choice of

foregoing treatment altogether or receiving treatment and

thereby waiving the psychotherapist—patient privilege.  We

certainly are not insensitive to the Hobson's choice faced by a

person in Bolander's position.  However, in this particular

case, Bolander simply failed to properly assert any privilege he

may have had.  Accordingly, the district court did not err when

it denied Bolander's motion <u>in limine</u>.[14]

---

[14] The government also argues that Bolander waived any psychotherapist/patient privilege he may have enjoyed when he executed the "INFORMED CONSENT FORM" as part of his participation in the SOTP.  (J.A. 168).  By executing this consent form, Bolander acknowledged that the information he provided in the program may be disclosed by the SOTP.  The consent form states: "I also understand that the staff of the SOTP and Federal Bureau of Prisons, Department of Justice, and United States Probation Office may share information regarding my case."  (J.A. 168).  The meaning of this provision in the consent form is ambiguous because it is unclear whether the information disclosed by Bolander could be "share[d]" amongst only these federal agencies or "share[d]" by these agencies with third parties, such as an expert in a civil commitment proceeding.  Bolander says the ambiguity is resolved by the provision in the consent form that says his "confidentiality will be protected at all times."  (J.A. 168).  Bolander posits that this provision means that the information he provided in the SOTP could not be disclosed to third parties; otherwise, his confidentiality would not be protected.  We need not resolve the government's waiver argument premised on the consent form because there are other bases in the record in which to find a (Continued)

IV

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED

---

waiver of any psychotherapist/patient privilege Bolander may have enjoyed.