PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Petitioner-Appellant,*

v.

No. 11-7102

CLYDE M. HALL,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:09-hc-02083-BO)

Argued: October 28, 2011

Decided: January 9, 2012

Before TRAXLER, Chief Judge, and MOTZ and
AGEE, Circuit Judges.

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Judge Motz and Judge Agee joined.

## COUNSEL

**ARGUED:** Ian James Samuel, UNITED STATES DEPART-
MENT OF JUSTICE, Washington, D.C., for Appellant. Eric
Joseph Brignac, Suzanne Little, OFFICE OF THE FEDERAL
PUBLIC DEFENDER, Raleigh, North Carolina, for Appellee.

**ON BRIEF:** Tony West, Assistant Attorney General, Mark B. Stern, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Thomas G. Walker, United States Attorney, Raleigh, North Carolina, for Appellant. Thomas P. McNamara, Federal Public Defender, Raymond C. Tarlton, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellee.

---

**OPINION**

TRAXLER, Chief Judge:

This case arises out of the federal government's initiation of civil commitment proceedings against Clyde Hall via a certification that Hall is a "sexually dangerous person" under 18 U.S.C. § 4248. Following an evidentiary hearing, the district court found that the government had failed to prove by clear and convincing evidence that Hall is sexually dangerous under the Act. We affirm.

I.

A.

Section 4248 of Title 18 was enacted as part of the Adam Walsh Child Protection and Safety Act of 2006 (the "Act"). It provides for the civil commitment of "sexually dangerous person[s]" following the expiration of their federal prison sentences. *See* 18 U.S.C. § 4248(a). A "sexually dangerous person" is one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). A person is considered "sexually dangerous to others" if "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in

refraining from sexually violent conduct or child molestation if released." *Id.*

The Attorney General, his designee, or the Director of the Federal Bureau of Prisons ("BOP") may initiate a § 4248 commitment proceeding in the district court for the district in which the person is confined by filing a certification that the person is sexually dangerous within the meaning of the Act. *See* 18 U.S.C. § 4248(a). The filing automatically stays the release of the person from custody pending a hearing before the district court. *See id.* "If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court shall commit the person to the custody of the Attorney General." 18 U.S.C. § 4248(d). *Id.*[1]

## B.

Clyde Hall was born in 1965. As a child, he was subjected to physical and emotional abuse by his parents. Beginning at the age of nine, he was subjected to sexual abuse by a sixteen-year-old female acquaintance, which continued for approximately eleven months. Hall's father banished him from the family home when Hall was sixteen years old. Shortly thereafter, he was sexually assaulted by an adult male, and he began to support himself as a prostitute. Hall also abused drugs and alcohol from the age of nine until the age of twenty-three, when he voluntarily ceased using these substances.

---

[1] If an order of commitment is obtained, the Attorney General must first attempt to release the person to "the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment." 28 U.S.C. § 4248(d). However, if the Attorney General is unsuccessful in this effort, he "shall place the person for treatment in a suitable facility, until" a state assumes responsibility or until "the person's condition is such that he is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment." *Id.*

Hall's first conviction for a sexual offense occurred in 1989, in Androscoggin County, Maine, when he was twenty-one years old. Hall pled guilty to one count of unlawful sexual contact and one count of gross sexual misconduct. According to the presentence report, "Hall exposed himself to a ten-year-old girl" and "touched her and had her 'help' him while he masturbated." J.A. 479. The following month "Hall got into bed with the same ten-year-old, touched her vagina with his hands and mouth, and had her touch his penis with her hands and mouth." J.A. 479. Hall was sentenced to four years in prison and six years of supervised release. He was released from prison in November 1991. Hall participated in a sex offender treatment program while in the custody of the state of Maine and continued treatment while on supervised release.

Hall's second conviction for a sexual offense occurred in 1999 in Essex County, New York, when he was thirty-three years old. Hall pled guilty to one count of acting in a manner injurious to a child, a class A misdemeanor offense. Hall was living with a woman and her young daughter at the time, and he showed the daughter and her friend, both of whom were ten years old, "drawings of unclothed females, intended to be pictures of ten-year-old girls." J.A. 480. In addition, "[t]he victim's mother reported that Mr. Hall sexually abused her daughter by having her wear lingerie for him, dancing with him, sitting naked on his naked lap, having oral sex performed on her and performing oral sex on Mr. Hall, and being shown sexual pictures of young girls by Mr. Hall." J.A. 480.

In September 1999, Hall was released from state custody. However, he was immediately arrested by federal authorities and convicted in federal district court in New York of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). This conviction arose out of a search of the residence where Hall was living with the woman and child involved in the New York state offense. Hall admitted accessing child pornography sites and admitted that he had down-

loaded and printed child pornography. He was sentenced to sixty-three months' imprisonment and three years of supervised release. While incarcerated, Hall participated in a sex offender treatment program at the Federal Institute at Butner, North Carolina ("FCI Butner"). In 2002, Hall completed the program and prepared a release prevention plan addressing his sexual offense history and risk factors, as well as the coping strategies, lifestyle changes, and support network he needed to manage his risk factors. When he was discharged from the program, he was assessed as being at a high risk of reoffending.

In April 2004, Hall was released to federal supervision, during which he continued to participate in sex offender treatment. Hall was also subjected to several polygraph tests while on supervised release. In June 2005, Hall gave a deceptive response when asked if he had touched the sexual organs of a minor while on supervised release. When confronted with the results, Hall stated that he masturbated to memories of his prior child victims approximately 45 percent of the time. However, Hall denied any hands-on child molestation offense since being released to supervision. In October 2005, Hall again gave a deceptive response when asked if he had engaged in sexual or physical contact with an adult since leaving the halfway house. In February 2006, Hall's supervised release was revoked "for violations of the program rules, inappropriate behavior with female clients, being defiant with staff, and failure to complete chores at the community correction's placement." J.A. 480. He was sentenced to four months in jail, six months in community confinement at a halfway house, and thirty months' supervised release.

In June 2006, Hall was again released to a community corrections center and, in December 2006, from the corrections center into the community. In September 2006, Hall gave no deceptive answers to polygraph questions designed to ensure that he was not reoffending. There are no reports of any sexual offenses committed by Hall against minors during his two

periods of supervised release (April 2004 to February 2006, and June 2006 to January 2007) and, therefore, no evidence that Hall has committed a sexual molestation offense against a child since the 1999 incident in New York.

In January 2007, the United States Probation Office was notified that Hall had viewed pornography and engaged in sex with an adult AA participant. Hall lost his job at approximately this same time, failed to report to the Probation Office or to his mental health treatment agency, and absconded from supervision. After he was apprehended, Hall's supervision was again revoked, and he was additionally charged and convicted for failure to register as a sex offender in violation of 18 U.S.C. § 2250(a)(1). In April 2008, Hall was sentenced to 25 months' imprisonment and 25 years' supervised release. The terms of the supervised release prohibit Hall from having contact with anyone under the age of 18, access to computers or other devices with online capabilities except at a place of employment, and from frequenting places where persons under the age of 18 are likely to congregate. The supervised release terms also require that he register as a sex offender, participate in sex offender treatment, mental health treatment and substance abuse treatment, and report to a probation officer as required.

Hall's projected release date from prison was June 24, 2009. However, several months before his release date, he was transferred to FCI Butner for an evaluation of his sexual dangerousness. On June 19, 2009, the BOP certified that Hall was a "sexually dangerous person" pursuant to § 4248(a), automatically staying his release pending an evidentiary hearing. Since that time, Hall has been found in possession of sexually inappropriate materials at FCI Butner, including pictures of prepubescent children and traced drawings of prepubescent girls with their clothing removed and their genitals drawn. Hall also obtained or attempted to obtain inappropriate mail at FCI Butner, including publications from Jam Marketing, Glamour Girl Photos, High Caliber, Heavy Metal Magazine,

Maxim Magazine and Teen Vogue. Hall has additionally been sanctioned at FCI Butner for various rules violations, including refusing to obey an order, being present in an unauthorized area, interfering with the taking of inmate count, and being insolent to a staff member.

On January 20, 2011, Hall requested an evidentiary hearing on the issue of his sexual dangerousness. At the conclusion of the hearing, the district court found that the government had failed to prove by clear and convincing evidence that Hall was a "sexually dangerous person" within the meaning of the Act. We stayed Hall's release pending the government's appeal of the district court's order, and expedited the appeal proceedings.[2]

## II.

## A.

To obtain a commitment order against Hall, the government was required to establish three distinct facts by clear and convincing evidence: that Hall (1) "has engaged or attempted to engage in . . . child molestation" in the past, 18 U.S.C.

---

[2]The § 4248 proceeding against Hall languished for approximately 19 months, while this court and the Supreme Court considered various constitutional challenges to § 4248, and the government's detention of former inmates under the statute's authority. *See United States v. Comstock*, 130 S. Ct. 1949 (2010); *Timms v. Johns*, 627 F.3d 525 (4th Cir. 2010); *United States v. Comstock (Comstock II)*, 627 F.3d 513 (4th Cir. 2010). Shortly after we issued our decisions in *Timms* and *Comstock II*, Hall requested that his evidentiary hearing proceed. Hall also had a motion to dismiss pending, asserting that § 4248 as applied to him violated his rights to due process and equal protection under the law. In addition to finding that Hall is not sexually dangerous under the Act, the district court granted Hall's motion to dismiss. Because we conclude that the district court did not clearly err in finding that Hall is not sexually dangerous under the Act, we do not address Hall's constitutional claims in this appeal, but note we rejected similar claims in the case heard seriatim with this one, *United States v. Timms*, No. 11-6886, the opinion in which is being filed at the same time as this opinion.

§ 4247(a)(5); (2) currently "suffers from a serious mental illness, abnormality, or disorder"; and (3) as a result of the illness, abnormality, or disorder, "would have serious difficulty in refraining from . . . child molestation if released," 18 U.S.C. § 4247(a)(6). *See United States v. Comstock*, 627 F.3d 513, 515-16 (4th Cir. 2010). "[C]lear and convincing has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001) (internal quotation marks, citations, and alterations omitted); *see also Addington v. Texas*, 441 U.S. 418, 423-24 (1979) (noting that the "clear and convincing" standard of proof is an "intermediate standard" that falls between a "mere preponderance of the evidence" and "beyond a reasonable doubt"); *see also Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (same).

On appeal, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *See* Fed. R. Civ. P. 52(a)(6); *United States v. White*, 620 F.3d 401, 410 (4th Cir. 2010); *United States v. Cox*, 964 F.2d 1431, 1433 (4th Cir. 1992). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948); *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks omitted). "This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had

it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573-74.

"When findings are based on determinations regarding the credibility of witnesses," we give "even greater deference to the trial court's findings." *Id.* at 575.

> [O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Id.* (citations omitted). As with lay witnesses, "[e]valuating the credibility of experts and the value of their opinions is [also] a function best committed to the district courts, and one to which appellate courts must defer," and we "should be especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony." *Hendricks v. Central Reserve Life Ins. Co.*, 39 F.3d 507, 513 (4th Cir. 1994).

B.

Here, there is no dispute that Hall engaged in past acts of child molestation, as evidenced by his prior convictions in 1989 and 1999. Thus, the district court found that the government established the first element of sexual dangerousness by clear and convincing evidence. *See* 18 U.S.C. § 4247(a)(5). There is also no dispute that Hall presently "suffers from a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4247(a)(6). Hall was diagnosed by several clinical psychologists as suffering from pedophilia and antisocial personality disorder, and the district court found that the government also established this second element by clear and convincing evidence. Hall does not challenge these findings on appeal.

The crux of this appeal, therefore, is whether the district court erred in finding that the government failed to prove, by clear and convincing evidence, that Hall, as a result of these disorders, "would have serious difficulty in refraining from . . . child molestation if released" from custody. 18 U.S.C. § 4247(a)(6).

As noted by the district court, the "serious difficulty" prong of § 4248's certification proceeding refers to the degree of the person's "volitional impairment," which impacts the person's ability to refrain from acting upon his deviant sexual interests. *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997) (noting that statutory requirements that couple proof of dangerousness with proof of a mental illness or abnormality "serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control"); *id.* at 357 (noting that civil commitment statutes may "provide[ ] for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety . . . provided the confinement takes place pursuant to proper procedures and evidentiary standards") (internal citations omitted); *see also Kansas v. Crane*, 534 U.S. 407, 414 (2002) (noting that "our

cases suggest that civil commitment of dangerous sexual offenders will normally involve individuals who find it particularly difficult to control their behavior").

> [This] lack of control [or] inability to control behavior will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.

*Crane*, 534 U.S. at 413 (internal quotation marks omitted). "Whether [an] individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington*, 441 U.S. at 429; *see also Comstock*, 627 F.3d at 521.

## C.

Three clinical and forensic psychologists evaluated Hall and testified at his evidentiary hearing, two on behalf of the government and one on behalf of Hall. Hall also testified on his own behalf. There were no objections raised to the qualifications of the expert witnesses, and the district court found each expert to be qualified to offer opinions on the issue of Hall's sexual dangerousness. The experts, utilizing actuarial tests, psychological tests, and their clinical judgment, arrived at conflicting opinions. Two of the experts, Dr. Dale Arnold and Dr. Lela Demby, testified that Hall would have serious difficulty refraining from child molestation if released and that Hall, therefore, was sexually dangerous within the mean-

ing of the Act. The third expert, Dr. Luis B. Rosell, testified that Hall would not have serious difficulty refraining from child molestation if released and that he, therefore, was not sexually dangerous within the meaning of the Act.

We begin with Dr. Arnold and Dr. Demby. Dr. Arnold used actuarial tools—the Static-99R, the Static-2002R, and the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R)—to determine group recidivism rates of sexual offenders considered by him to be most analogous to Hall, and found a group rate of recidivism as high as 36% over ten years. Such actuarial tests, however, only gauge a risk of recidivism based upon the statistics of the particular group of sex offenders selected for comparison. According to the evidence presented, knowing the recidivism rate of a particular group does not mean that the individual under consideration poses the same chance of recidivism in the same time frame; his risk could be higher or lower than that of the group based upon the unique circumstances of his case. Thus, experts using these tools also consider, among other things, the age of the particular offender, his participation in treatment, his compliance with such treatment, his history of reoffending after treatment, and his commitment to controlling his deviant behavior.

In determining that Hall would have serious difficulty refraining from future acts of child molestation, Dr. Arnold found particularly significant Hall's history of a high number of adult sexual partners, both male and female; Hall's report that he masturbates to the memories of his prior child victims 45% of the time; Hall's ongoing interest in pictures and drawings of children and adolescents while in BOP custody; and Hall's general failure to follow rules and cooperate while under supervision and while awaiting his certification hearing.

Dr. Demby used the Static-99R and the Static-99 actuarial tools in her evaluation of Hall. Her opinions in large part mirrored those of Dr. Arnold. Like Dr. Arnold, Dr. Demby was most persuaded that Hall was sexually dangerous due to his

ongoing failure to comply with rules and directives while under supervision and after his certification, as well as his continued, deviant interest in collecting pictures and drawings of children pending his certification hearing.

The third expert, Dr. Rosell, also used the Static-99R, Static-2002R, and additionally used the Multisample Age Stratified Table of Sexual Recidivism Rate ("MATS") actuarial tools in his evaluation of Hall. He varied from the other experts in his selection of the comparative group but testified that the group recidivism rates were as high as 25% over eight years. Applying individual factors, Dr. Rosell opined that Hall was not a sexually dangerous person. Of particular significance, Dr. Rosell was persuaded by the fact that Hall had a limited history of child molestation offenses and a limited number of child victims, had undergone sex offender treatment, and had demonstrated, by being in the community for twenty-eight months without a hands-on offense, that he could refrain from engaging in child molestation despite ample opportunity to do so. According to Dr. Rosell:

> Hall has had a significant amount of time in the community since his last hands-on offense and currently, in my opinion, although he has not been compliant on supervision or while confined he does not appear to be an individual who would engage in future acts of sexual violence because he has not demonstrated a serious difficulty in controlling his behavior and was able to refrain from sexual violent conduct or child molestation while in the community over an extended period of time.

J.A. 184. Additionally, Dr. Rosell noted that "[a] review of actuarials, as well as protective factors, such as some treatment completion, honesty with regards to sexual history, an understanding of his offense behavior and an appropriate release plan, [indicate that] Hall is [at a] lower risk for sexual-[ly] dangerous behavior." J.A. 184. With regard to Hall's

ongoing and admittedly troubling interest in pictures and drawings of children since his certification, Dr. Rosell testified that this behavior alone did not indicate that Hall would likely reoffend, and he pointed to recent research suggesting that hands-on offenders who possess such materials have a lower recidivism rate than those who do not collect such materials. Finally, Dr. Rosell observed that Hall would be subject to twenty-five years of stringent restrictions when released and could receive a sentence of life imprisonment if he reoffended, both of which would likely have an additional deterrent effect on Hall.

After hearing and weighing the conflicting testimony of the expert witnesses, the district court found "the opinion of Dr. Rosell to be the most well reasoned and persuasive" of the expert opinions. J.A. 506. Specifically, the district court found as follows:

> Dr. Rosell, like Dr. Arnold, based his opinion on clinical judgment, actuarial instruments, and psychological tests. The Court is persuaded that Dr. Rosell's method of synthesizing the available data and applying it to Mr. Hall has given the Court a more accurate depiction of Mr. Hall's risk of reoffending. Dr. Rosell utilized the same actuarial instruments and psychological tests as Dr. Arnold and Dr. Demby; however, he provided a more complete discussion of the tests' strengths and weaknesses. For instance, not only did he provide a scholarly comment on the false/negative aspects of the actuarial instruments, but he did not limit his analysis of the recidivism rates to only one or two sample groups but provided recidivism rates for all sample groups. He gave more credence to the fact that Mr. Hall spent a considerable time in the community with no new hands-on sex offenses which the Court finds to be a persuasive factor that Mr. Hall will not recidivate. Lastly, he correctly acknowledged that if

released Mr. Hall will be under supervision for twenty-five years. This Court finds the lengthy and onerous conditions that will be imposed on Mr. Hall if released give further assurance that Mr. Hall will not reoffend.

J.A. 506.

The district court additionally considered the content of Hall's testimony and found that Hall was a credible witness. The district court found that Hall "appears to understand the severe consequences he faces if convicted of a new sexual offense" and "the harm he has done to his victims." J.A. 506-07. The district court also found that Hall understands "the methods he must employ to ensure that he does not molest children" in the future, and that he "appears to be committed to not reoffending." J.A. 507.

### III.

On appeal, the government does not take issue with the district court's credibility determinations. Rather, the government argues that the district court erred by giving controlling weight to the fact that Hall was on supervised release for twenty-eight months without committing a molestation offense against a child. The government argues that the district court thereby altered § 4248's requirement that it demonstrate that Hall would have serious difficulty refraining from child molestation to one requiring that it demonstrate insurmountable difficulty, and ensured that any respondent who can point to even a brief time in which his desires for children were controlled would be ineligible for commitment. A review of the district court's order, however, belies the government's assertion in this regard. And a review of the entire record leaves us unable to say that the district court's factual findings are clearly erroneous.

As noted above, the district court clearly considered and weighed the testimony of the experts and of Hall. The experts

considered actuarial tests, psychological tests, and Hall's individual circumstances, and made clinical judgments based upon their evaluations. The actuarial tools relied upon by the experts yielded a group recidivism rate of individuals who scored similarly to Hall in the moderate to moderate-high range. Depending upon the group to which Hall was compared and the particular test employed, the range spanned from approximately a 10% to 36% recidivism rate over a ten-year period. In the end, however, the core of the experts' disagreement centered not so much on the actuarial tools or the group rates of recidivism, as it did on the results of Hall's psychological tests, his individual circumstances, and the experts' respective interpretations of whether and to what extent Hall's circumstances affected his ability to control his sexual urges towards prepubescent children.

As noted by the district court and Dr. Rosell, Hall has had a limited number of hands-on child molestation offenses and victims, particularly when compared to other pedophiles. And while the record evidence indicates that Hall had somewhat limited success in various sex offender treatment programs, it is undisputed that Hall participated in such treatment and was instructed in, among other things, coping skills to deal with his pedophilia. In sum, Hall was convicted of two offenses involving child molestation, his last child molestation offense occurred in 1999, and he spent a total of approximately twenty-eight months in the community (between April 2004 and January 2007), after completing the sex offender treatment program at FCI Butner, without any reported hands-on child molestation offense.

Additionally, the district judge who was in a position to observe Hall's testimony, found him to be credible, and relied upon his testimony in making his findings. Hall testified that he is remorseful, understands the damage he caused his prior victims, and understands the risks of reoffense. He also testified that he has developed coping skills to keep him from acting upon his impulses, and that he employed these coping

strategies while in the community on supervised release. Finally, Hall faces a 25-year period of supervised release that includes substantial restrictions designed to prevent his reoffending and the risk of life imprisonment if he does reoffend. Thus, while the district court found Hall's time in the community without reoffense "to be a persuasive factor that Mr. Hall will not recidivate," J.A. 506, it is clear to us that the district court did not place exclusive or controlling weight upon this single factual finding.

Finally, we cannot say that the district court's finding that Hall is not sexually dangerous is clearly erroneous. Weighed against the evidence found most persuasive by the district court was Hall's troubling history of failing to comply with institutional rules and supervised release conditions, as well as his continued sexual interest in pictures and drawings of prepubescent children. As the experts noted, Hall's pedophilia and antisocial personality disorder have led him to continue to break rules and to seek out inappropriate sexual materials. Dr. Arnold and Dr. Demby placed great weight upon this non-contact misconduct as evidence that Hall would also have serious difficulty refraining from acting upon his pedophilic urges if released. Dr. Rosell, however, testified that Hall's non-contact misconduct does not alone indicate a likelihood of a hands-on reoffense, and concluded that Hall's behavior while confined at FCI Butner was not sufficient, in his opinion, to overcome the other circumstances that indicated that he would not likely reoffend. The government presented no evidence upon which we could conclude that Dr. Rosell's interpretation of Hall's possession of these materials was unreasonable, and the district court did not clearly err in crediting Dr. Rosell's opinion over those of Dr. Arnold and Dr. Demby. *Compare United States v. Shields*, 649 F.3d 78, 90 (1st Cir. 2011) (noting that where "[t]wo of the testifying experts interpreted Shields's child pornography offense as a sign of ongoing deviance rather than improved impulse control, . . . it was entirely reasonable for the court to credit their testimony over Shields's expert's opinion.").

Accordingly, we reject as unsupported by the record the government's claim that the district court applied an impermissibly high burden of proof under § 4248, and we hold that the district court's factual findings are not clearly erroneous. Having reviewed the record in its entirety, we cannot say that the district court's account of the evidence is implausible in light of the record as a whole, even though we might well have weighed the evidence differently. *See Anderson*, 470 U.S. at 573-74.

## IV.

The question of whether a person is "sexually dangerous" is "by no means an easy one," and "there is no crystal ball that an examining expert or court might consult to predict conclusively whether a past offender will recidivate." *Shields*, 649 F.3d at 89. "In the end, however, it is for the factfinder to decide among reasonable interpretations of the evidence and determine the weight accorded to expert witnesses." *Id.* (internal quotation marks omitted); *see also United States v. Carta*, 592 F.3d 34, 42 (1st Cir. 2010) (noting that the factfinder is to determine "[w]hose [expert] analysis is more persuasive").

Here, the district court's application of the statutory standards to the evidence is not erroneous, and its factual findings represent a permissible and reasonable interpretation of the evidence presented at the hearing. Because we are not "left with the definite and firm conviction that a mistake has been committed" by the district court, *United States Gypsum Co.*, 333 U.S. at 395, we cannot say that the district court clearly erred in finding that Hall is not sexually dangerous within the meaning of the Act. Accordingly, we affirm the district court's order dismissing the government's commitment action.

*AFFIRMED*