**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-6043

UNITED STATES OF AMERICA,

Petitioner - Appellee,

v.

JOSE DE LA LUZ PEREZ,

Respondent - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge. (5:11-hc-02015-BR-JG)

Argued: January 28, 2014        Decided: May 15, 2014

Before TRAXLER, Chief Judge, and MOTZ and THACKER, Circuit Judges.

Affirmed by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Motz and Judge Thacker joined.

**ARGUED**: Jenna Turner Blue, BLUE, STEPHENS & FELLERS, LLP, Raleigh, North Carolina, for Appellant. Matthew Fesak, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF**: Thomas G. Walker, United States Attorney, R.A. Renfer, Jr., Edward D. Gray, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

TRAXLER, Chief Judge:

Jose De La Luz Perez appeals from an order of the district court concluding after an evidentiary hearing that Perez is a "sexually dangerous person," 18 U.S.C. § 4248(a), under the Adam Walsh Child Protection and Safety Act of 2006 (the "Act"), Pub. L. No. 109-248, 120 Stat. 587, and committing him to the custody of the United States Attorney General. Perez asks us to vacate the civil commitment order, contending that the district court lacked personal jurisdiction because the government failed to serve him with a summons pursuant to Rule 4 of the Federal Rules of Civil Procedure. Alternatively, Perez argues that the district court's finding that he is a "sexually dangerous person" under the Act was clearly erroneous. As explained below, we affirm.

I.

Under the Act, the government has the authority to civilly commit "sexually dangerous" federal inmates following the expiration of their federal prison sentences. 18 U.S.C. § 4248(a); see United States v. Wooden, 693 F.3d 440, 442 (4th Cir. 2012). The statute defines a "sexually dangerous person" as one "who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). A person is considered "sexually dangerous to others" if "the person suffers from a

2

serious mental illness, abnormality, or disorder as a result of which he <u>would have serious difficulty in refraining from sexually violent conduct or child molestation if released.</u>" <u>Id.</u> § 4247(a)(6) (emphasis added).

The Attorney General or the Director of the Bureau of Prisons ("BOP") may commence a § 4248 commitment proceeding by filing with the clerk of court for the district in which the respondent is confined a certification that the person is sexually dangerous as defined by the Act. <u>See id.</u> § 4248(a). The "filing automatically stays the release of the person from custody pending a hearing before the district court." <u>United States v. Heyer</u>, 740 F.3d 284, 286 (4th Cir. 2014); <u>see</u> 18 U.S.C. § 4248(a). The district court is then "required to convene a hearing to afford the government the opportunity to prove the ultimate truth of its certification." <u>United States v. Caporale</u>, 701 F.3d 128, 131 (4th Cir. 2012); 18 U.S.C. § 4248(a) ("The court <u>shall</u> order a hearing to determine whether the person is a sexually dangerous person." (emphasis added)). "If, after the hearing, the court finds by clear and convincing evidence that the person is a sexually dangerous person, the court <u>shall</u> commit the person to the custody of the Attorney General." 18 U.S.C. § 4248(d) (emphasis added).

3

II.

In December 2011, Perez was incarcerated at the BOP facility in Butner, North Carolina, where he was serving the final few months of a 20-year federal sentence for (1) transportation of a minor in foreign commerce with intent to engage in criminal sexual activity, see 18 U.S.C. § 2423(a), and (2) importation of an alien for immoral purposes, see 8 U.S.C. § 1328. On January 6, 2011, the BOP Certification Review Panel filed in the Eastern District of North Carolina a certification seeking to have Perez civilly committed as a "sexually dangerous person." 18 U.S.C. § 4248(a). Perez subsequently moved to dismiss the commitment proceedings on the basis that the government failed to comply with Rule 4(c)(1) of the Federal Rules of Civil Procedure by failing to serve a summons. The United States filed a response in opposition to Mr. Perez's motion, arguing that § 4248 only requires the filing of a certification to initiate commitment proceedings, not a standard civil summons. The United States argued, in the alternative, that Perez's service of process argument was barred by Rule 12(h)(1) because he failed to raise it in a prior motion that addressed other procedural issues. The district court denied the motion to dismiss on slightly different grounds, concluding that even if service of the summons was required here, dismissal was not mandatory where, as here, Perez received actual notice

4

of the § 4248 proceeding and suffered no prejudice from the government's failure to serve him with a summons.

As mandated by the Act, the district court conducted an evidentiary hearing "to determine whether [Perez was] a sexually dangerous person." 18 U.S.C. § 4248(a). Any person subject to a hearing pursuant to the Act "shall be represented by counsel" and "shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." 18 U.S.C. § 4247(d); see id. § 4248(c) ("The hearing shall be conducted pursuant to the provisions of section 4247(d)."). Perez moved to proceed pro se, and the court found that Perez knowingly and voluntarily elected to appear without legal counsel. Believing that the proceedings against him were unlawful, however, Perez refused to be present or otherwise participate in the hearing. Accordingly, the hearing was conducted in Perez's absence.

The government presented the expert testimony of three forensic psychologists who each performed a pre-hearing evaluation of Perez for the purpose of determining whether he was a "sexually dangerous person" under the Act: Dr. Hy Malinek, a forensic psychologist who has evaluated hundreds of individuals in § 4248 commitment proceedings; Dr. Heather Ross, also a forensic psychologist specializing in the assessment of

sex offenders; and Dr. Joseph Plaud, a forensic psychologist who was appointed on behalf of Perez.  See 18 U.S.C. § 4247(b).  All three experts prepared written reports stating their opinions and summarizing the bases for their opinions.

In making their assessments, all three experts reviewed Perez's criminal history records which established the following.  In September 1970, Perez was arrested for abducting a seven-year-old boy at a laundromat in San Antonio, Texas.  Perez drove the boy to a motel where he held the boy overnight and forced him to engage in oral sodomy numerous times.  The next morning, Perez dropped the boy off in the street fifteen blocks away from his home.  Perez was convicted in Texas state court of kidnapping a minor from his parents and sentenced to 25 years imprisonment.  See Perez v. State, 478 S.W.2d 551 (Tex. Crim. App. 1972).  He was released on parole in May 1979.

In May 1982, Perez made sexual contact with a nine-year-old boy in a dressing room at a mall.  The boy's mother reported the incident to a security officer who then returned with the boy to the dressing room and found Perez victimizing a twelve-year-old boy.  The nine-year-old victim identified Perez as the molester.  In each case, Perez approached the boy and offered him money to try on jeans, suggesting that they were the same size as Perez's nephew, for whom Perez was shopping.  Each victim fell for Perez's ruse, and Perez entered the dressing room with them and

6

asked how the jeans fit. Eventually, Perez put his hands down the boys' pants and felt their genitals, patted their buttocks, and asked them to bend over and touch their toes.

Perez was arrested at the time of the offense in May 1982. After being placed on bond, Perez fled and evaded detection for several years. He was eventually apprehended in March 1987. The charge involving the mall dressing room molestation was dismissed because the nine-year old victim could not be located, but Perez was convicted under Texas law in November 1987 of indecency with a child in relation to the twelve-year-old victim. The charge also alleged that Perez had one prior felony conviction for enhancement purposes. Perez was sentenced to five years' imprisonment in Texas. He was paroled in February 1989 and was discharged from parole in August 1992.

During the time that he was a fugitive from charges relating to the mall incident in 1982, Perez was convicted of indecency with a child and sentenced to five years of probation in March 1983 in Texas. This offense, which occurred approximately six months after the offense in the mall, took place as Perez was selling subscriptions door-to-door and noticed a young boy in a woman's apartment. After making a sale to her, Perez left but returned a short time later, asking to use the telephone. While he was on the telephone, the woman told her ten-year-old son to take the trash out to the dumpster

7

in the parking lot. Perez followed the boy into the parking lot, where he pinched and rubbed the child's buttocks, touched him on the front of his pants, and told him to unzip his pants. The victim was instructed not to tell anyone about what happened. Finally, in September 1993, Perez was arrested after agents from the Immigration and Naturalization Service executed a search warrant at his house in Texas. The agents found two boys, ages twelve and thirteen, who were living with Perez and Perez's father. The boys were Mexican citizens and were living in the United States illegally.

Interviews with the boys revealed that they had been living with respondent and his father for approximately two years, after respondent picked them up on the street in El Paso, Texas. The twelve-year-old boy reported that respondent began sexually abusing them the very next day. The reported sexual abuse involved anal intercourse and occurred in several locations besides the home, including locations in the state of New Mexico. Perez also transported the boys to and from Mexico on several occasions. At least three other children were interviewed during the investigation and reported that respondent had sexually molested them. Medical evaluations of the two reported victims revealed signs consistent with chronic perianal trauma.

8

In 1993, Perez pled guilty to Transportation of a Minor in Foreign Commerce with Intent to Engage in Aggravated Sexual Assault and to Importation of an Illegal Alien for the Immoral Purpose of Sexual Assault. He was sentenced to 120 months' imprisonment on each charge, to be served consecutively, as well as three years of supervised release.

In addition to reviewing this criminal offense history, all three experts sought to interview Perez. Drs. Malinek and Ross were rebuffed by Perez, who refused to cooperate. Dr. Plaud was more successful, eliciting a few limited statements from Perez relating to his personal sexual history. All three experts, however, found Perez's statements to Dr. Plaud to be significant and considered them in assessing Perez's sexual dangerousness. The experts unanimously diagnosed Perez with pedophilia, marked by an exclusive sexual attraction to young males, a condition all agreed qualified as "a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4247(a)(6). And, finally, all three experts agreed that Perez would have serious difficulty refraining from child molestation upon release from custody.

The district court found that the government established by clear and convincing evidence that Perez was a "sexually dangerous person" as defined by § 4247(a)(5), and that civil commitment was therefore required under § 4248(d). First, based on Perez's criminal records, the court found that Perez "has

9

engaged or attempted to engage in sexually violent conduct or child molestation" in the past. Id. § 4247(a)(5). Second, based on the unanimous opinions of the expert witnesses, the district court concluded that Perez "suffers from a serious mental illness, abnormality, or disorder." Id. § 4247(a)(6). And third, relying on the detailed testimony of the experts as well as Perez's criminal history, the district court held that the government had proven that Perez's pedophilia "presently impairs respondent's volitional ability to refrain from deviant behavior and that, absent abatement by effective treatment, would in the future give him serious difficulty in refraining from child molestation or sexually violent conduct." J.A. 181-82.

### III.

In an appeal from an order granting or denying a civil commitment under the Act, "we review the district court's factual findings for clear error and its legal conclusions de novo." United States v. Hall, 664 F.3d 456, 462 (4th Cir. 2012). Perez's first challenge to the district court's commitment order is a purely legal one—that the district court could not exercise personal jurisdiction over him because he was never served with a summons pursuant to Rule 4. We reject this argument.

10

A civil action in federal court commences with the filing of a complaint, see Fed. R. Civ. P. 3, and personal service of a summons and a copy of the complaint upon the defendant, see Fed. R. Civ. P. 4(c)(1). Rule 4 dictates that the summons must, among other things, identify the court and the parties; apprise the defendant when he or she must appear to defend against the allegations; and warn the defendant that failure to appear will result in a default judgment in favor of the plaintiff. See Fed. R. Civ. P. 4(a)(1). If the summons is not served on the defendant within 120 days after the complaint is filed, dismissal is required unless the district court extends the time for good cause shown. See Fed. R. Civ. P. 4(m). It is undisputed that the government never served Perez with a summons and that no extension of time was sought or granted. The government contends, however, that service of a standard civil summons under Rule 4 is not required to commence civil commitment proceedings under § 4248 against an allegedly "sexually dangerous person" in the custody of the BOP.

As Perez points out, a commitment proceeding under § 4248 is civil and not criminal in nature, see United States v. Timms, 664 F.3d 436, 455-56 (4th Cir. 2012), and thus, broadly speaking, the Federal Rules of Civil Procedure would apply to a § 4248 commitment proceeding. Rule 1 provides that "[t]hese rules govern the procedure in all civil actions and proceedings

11

in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1. Although Rule 81 enumerates several types of civil actions or proceedings to which the Rules of Civil Procedure, to one extent or another, do not apply, a civil commitment proceeding pursuant to 18 U.S.C. § 4248 is not among them. See Fed. R. Civ. P. 81.

That the Rules of Civil Procedure generally apply to civil commitment proceedings under the Act, however, does not mean that they cannot be displaced by specific procedural provisions included in the Act. Congress "has ultimate authority over the Federal Rules of Civil Procedure; it can create exceptions to an individual rule as it sees fit—either by directly amending the rule or by enacting a separate statute overriding it in certain instances." Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 400 (2010). The question is whether the Act requires the government to serve a summons pursuant to Rule 4 upon a respondent in federal custody despite the obvious differences between the initiation of civil commitment proceedings under § 4248 and a typical civil action. We think not.

The Act does not expressly indicate whether service of a summons is required; "service of process" under Rule 4 is simply not mentioned. However, the Act is not silent as to how to

12

initiate and to notify the respondent of a § 4248 commitment proceeding:

> **Institution of proceedings**. In relation to a person who is in the custody of the Bureau of Prisons, . . . the Attorney General or any individual authorized by the Attorney General or the Director of the Bureau of Prisons may certify that the person is a sexually dangerous person, and transmit the certificate to the clerk of the court for the district in which the person is confined. The clerk shall send a copy of the certificate to the person, and to the attorney for the Government . . . .

18 U.S.C. § 4248(a) (emphasis added). The Act provides a streamlined procedure for initiating commitment proceedings against individuals in BOP custody who have been certified as "sexually dangerous" under § 4248. Under the Act, "[t]he Attorney General, his designee, or the Director of the [BOP] may initiate a § 4248 commitment proceeding in the district court for the district in which the person is confined by filing a certification that the person is sexually dangerous within the meaning of the Act." Heyer, 740 F.3d at 286 (emphasis added). And, rather than require the government to effect formal service of the certificate and a standard summons upon the respondent, the Act directs the clerk of court simply to "send a copy of the certificate to the person" in BOP custody who was certified as "sexually dangerous." 18 U.S.C. § 4248(a).

We conclude that the procedure set forth in 18 U.S.C. § 4248(a) for initiating proceedings for the civil commitment of a

13

sexually dangerous person supplants the summons requirement set forth in Rule 4. Service of process pursuant to Rule 4 serves two primary functions in a typical civil action in federal court: it provides formal notice to the defendant to appear and defend against an action that has been commenced in federal court, and it is the means by which the court asserts its personal jurisdiction over the defendant. See Henry H. Perritt, Jr., Jurisdiction in Cyberspace, 41 Vill. L. Rev. 1, 31 (1996) ("Service of process performs two functions in Anglo-American civil procedure: it represents assertion of judicial power of the forum state over the person of the defendant, and it is the formal means of providing notice to the defendant so that he or she may defend the lawsuit."). In the unique context of a § 4248 proceeding, however, service of a standard summons under Rule 4 is not necessary to perform either function.

First, the paramount function of serving a summons is to provide formal notice to the defendant that action is required to avoid liability and preserve his or her rights. Service of the summons apprises a defendant "of the pendency of the action" and "afford[s] [the defendant] an opportunity to present [his] objections." Peralta v. Heights Med. Ctr., Inc., 485 U.S. 80, 84 (1988) (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)). Establishing notification to a civil defendant through proper service of the summons is critical

14

since, among other things, service of the summons triggers defendant's duty to file a responsive pleading to the complaint, see Fed. R. Civ. P. 12(a)(1)(A)(i) ("A defendant must serve an answer . . . within 21 days after being served with the summons and complaint."), and the failure to respond in a timely fashion can result in liability being imposed by default, see Fed. R. Civ. P. 55(a).

The respondent in a § 4248 civil commitment proceeding, by contrast, is not required to file any responsive pleading and faces no risk of a contrary merits determination being entered by default or without his knowledge. In fact, Congress afforded § 4248 respondents a number of procedural safeguards, including a mandatory evidentiary hearing, see 18 U.S.C. § 4248(a) ("The court shall order a hearing to determine whether the person is a sexually dangerous person."); id. § 4248(d) (granting district courts the power to "commit the [respondent] to the custody of the Attorney General" after the mandatory hearing); and the right to be represented by an attorney at the mandatory evidentiary hearing, see id. §§ 4248(c), 4247(d) (providing that "[a]t a hearing ordered pursuant to this chapter the [respondent] . . . shall be represented by counsel and, if he is financially unable to obtain adequate representation, counsel shall be appointed for him"). Moreover, at the mandatory hearing, the respondent "shall be afforded an opportunity to

15

testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." Id. § 4247(d). In light of these procedural safeguards inherent in § 4248 proceedings, receipt of a copy of the certificate initiating commitment proceedings suffices to provide notice to the respondent—and it is undisputed that Perez was provided a copy of the certificate seeking to have him committed as a "sexually dangerous person." Service of a summons is unnecessary in this context in view of the fact that Congress provided another means of notifying the respondent of the proceedings as well as several procedural safeguards.[1] See Meadows v. Krischer, 763 So. 2d 1087, 1091 (Fla. Dist. Ct. App. 1999) (concluding that "a standard civil summons would be unnecessary" to initiate proceedings under Florida law providing for the civil commitment of "sexually violent predators" where the law did not require service of a regular civil summons).

A second function performed by service of a civil summons under Rule 4 is to assert the district court's jurisdiction over a person. "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied. Service of summons is the procedure by which a court having venue and jurisdiction of the

---

[1] Perez does not challenge the constitutional sufficiency of the notice prescribed by 18 U.S.C. § 4248(a).

16

subject matter of the suit asserts jurisdiction over the person of the party served." Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987) (emphasis added) (internal quotation marks and alteration omitted). Historically, however, personal jurisdiction in both the civil and criminal contexts flowed from physical custody or control over the defendant. See ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 710-11 (4th Cir. 2002) ("[T]he limits on personal jurisdiction were grounded in a court's power over the actual person of the defendant. Thus, a person's 'presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him.'" (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Over time in the civil context, "[t]he idea of 'minimum contacts' developed as a surrogate for actual presence in a State but did not alter the essentially territorial nature of jurisdiction." Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1228 (9th Cir. 2006) (en banc) (O'Scannlain, J., concurring in judgment). Personal jurisdiction in a criminal case is still based on physical presence, which is usually acquired by taking the defendant into custody via arrest. See United States v. Wilson, 721 F.2d 967, 972 (4th Cir. 1983) ("It has long been the general rule that a court's power to try a criminal defendant is not impaired by the government's use of even forcible abduction

17

to bring the defendant within the court's jurisdiction."); United States v. Rendon, 354 F.3d 1320, 1326 (11th Cir. 2003) ("A federal district court has personal jurisdiction to try any defendant brought before it on a federal indictment charging a violation of federal law."). Even if physical custody is no longer _necessary_ to endow a civil court with personal jurisdiction over a defendant, it is clearly _sufficient_ to do so. Thus, that the government has physical custody over the respondent in § 4248 civil commitment proceedings obviates the need for a summons.

IV.

Next, Perez contends that the district court committed clear error in finding him to be a "sexually dangerous person." 18 U.S.C. § 4248(d). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Hall, 664 F.3d at 462 (internal quotation marks omitted).

To obtain a civil commitment order under the Act, the government must prove three elements by clear and convincing evidence. See United States v. Wood, 741 F.3d 417, 419 (4th Cir. 2013). The government first must demonstrate that the person has previously "engaged or attempted to engage in . . . child molestation." 18 U.S.C. § 4247(a)(5); see Wood, 741 F.3d

18

at 419. Second, the government must establish that the person currently "suffers from a serious mental illness, abnormality, or disorder." 18 U.S.C. § 4247(a)(6); Wood, 741 F.3d at 419. And third, "the government is required to show that the defendant, as a result of the illness, abnormality, or disorder, 'would have serious difficulty in refraining from . . . child molestation if released.'" Wood, 741 F.3d at 419 (quoting 18 U.S.C. § 4247(a)(6)). "Clear and convincing" evidence is "evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established, and, as well, as evidence that proves the facts at issue to be highly probable." Jimenez v. DaimlerChrysler Corp., 269 F.3d 439, 450 (4th Cir. 2001) (internal quotation marks, citations, and alterations omitted). "[T]he 'clear and convincing' standard of proof is an 'intermediate standard' that falls between a 'mere preponderance of the evidence' and 'beyond a reasonable doubt.'" Hall, 664 F.3d at 461 (quoting Addington, 441 U.S. at 423-24).

Perez does not dispute that the government established the first two elements by clear and convincing evidence – (1) that he previously engaged or attempted to engage in child molestation and (2) that he suffers from a serious mental illness, abnormality, or disorder, i.e., pedophilia. Perez challenges only the district court's finding that as a result of

19

his pedophilia, "he would have serious difficulty in refraining from . . . child molestation if released." 18 U.S.C. § 4247(a)(6). "[T]he serious difficulty prong of § 4248's certification proceeding refers to the degree of the person's volitional impairment, which impacts the person's ability to refrain from acting upon his deviant sexual interests." Hall, 664 F.3d at 463 (internal quotation marks omitted). The "'lack of control or inability to control behavior will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior.'" Id. (quoting Kansas v. Crane, 534 U.S. 407, 413 (2002)) (alteration omitted).

Perez contends that the government's evidence rested almost entirely on his criminal offense history and failed to adequately account for Perez's current level of volitional impairment. Perez claims, moreover, that any expert opinion about his present mental state and capacity for volitional control rests on speculation, especially, he points out, because none of the experts who testified at the commitment hearing interviewed him.

First, we reject Perez's suggestion that the district court's substantial consideration of his criminal offense history was erroneous or improper. Although "[t]he nature of [Perez's] prior crimes may well be a historical factor, . . . it

20

is by no means a stale or irrelevant one.  When the question is whether an inmate suffering from pedophilia will have serious difficulty refraining from re-offending if released, consideration of the nature of his prior crimes provides a critical part of the answer."  Wooden, 693 F.3d at 458.

Moreover, it is not entirely accurate to suggest that each expert evaluation was completed without Perez being interviewed. Although Perez refused to submit to pre-hearing interviews with the government's psychologists, he ultimately participated to some extent in Dr. Plaud's interview.[2]  Perez refused to discuss his offense history with Dr. Plaud, but he did comment generally on his sexual history, denying pedophilic sexual arousal and "presenting himself as a . . . non-violent, moral heterosexual male."  J.A. 109.  Despite this self-characterization, Perez admitted to Dr. Plaud that he had never experienced sexual relations with an adult woman.  Because these comments were so completely at odds with Perez's offense history, his statements during the interview raised concerns for Dr. Plaud that Perez possibly suffered "cognitive distortions, bordering on

---

[2] Dr. Plaud explained that "[a]t the outset, Mr. Perez did not indicate . . . that he even wanted to participate in the interview" but that Perez "reconsidered as [Dr. Plaud] began to leave."  J.A. 108.

21

delusion[s]" regarding his sexuality. J.A. 110.[3] Perez also told Dr. Plaud that he does not need sexual offender treatment, supporting Dr. Plaud's belief that Perez is "an untreated pedophile who is actively denying his sexual arousal patterns." J.A. 111. Dr. Plaud indicated that he learned nothing from the clinical interview that suggested Perez ever acquired the ability to regulate and control his sexual impulses or that he "has the present-day ability to monitor and control his sexual impulses." J.A. 230. Significantly, Drs. Malinek and Ross both considered Perez's statements to Dr. Plaud and incorporated them into their own analyses. Accordingly, the lack of a formal interview with either Dr. Malinek or Dr. Ross—which was of Perez's own making—did not render either report unreasonable or speculative.

We conclude that the government easily presented sufficient evidence to support the conclusion that, by clear and convincing evidence, Perez, as a result of his pedophilia, "would have serious difficulty in refraining from . . . child molestation if released." 18 U.S.C. 4247(a)(6). First, the government submitted written evaluations conducted by its expert

---

[3] Dr. Plaud also observed, however, that it was difficult to determine "how serious . . . he took the entire interview process" and that Perez may have been merely trying to "elicit a reaction" from Dr. Plaud by claiming to be a heterosexual male. J.A. 110.

22

psychologists, Drs. Malinek and Ross.  Both experts considered (1) actuarial scales incorporating static risk factors for sex offenders to determine a statistical likelihood that Perez would engage in child molestation again, and (2) dynamic risk factors from the STABLE-2007 scale.  "[U]nlike static factors, which typically are historical and do not change, a dynamic risk factor refers to something that has the capacity to change over time, for example with treatment."  United States v. Bolander, 722 F.3d 199, 209 (4th Cir. 2013).

Dr. Malinek "considered the most recent published studies and risk assessment formulas" to determine whether Perez would at the time of the evaluation have serious difficulty refraining from child molestation if released from BOP custody.  Dr. Malinek applied three different actuarial scales "that assess baseline recidivism risk in sexual offenders."  J.A. 214. First, Perez's risk of reoffending was assessed using the Static-99R scale, which incorporates numerous static factors such as prior sex offenses, age at release, and whether the person had any "unrelated victims," "stranger victims," or "male victims."  J.A. 215.  Dr. Malinek scored Perez a 4 on the Static-99R, which placed him in the moderate-high risk category and suggested "recidivism rates of 15.4% in five years and 22.6% in ten years."  J.A. 218.  Second, Dr. Malinek used the Static 2002-99R scale.  This risk assessment formula takes into account

23

five static categories, including age, persistence of sexual offending, deviant sexual interests, relationship to the victims, and general criminality. Dr. Malinek scored Perez a 7 on the Static-2002R, placing him in the moderate-high risk category. Offenders assessed with a similar score and grouping as Perez "have been found to sexually reoffend at a rate of 25.2 percent in five years and 35.8 percent in ten years." J.A. 220. Finally, Perez was assessed using the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R). Dr. Malinek gave Perez a score of 12 on the MnSOST-R, placing him in the high risk category with an "expected recidivism rate within six years of release [of] 30 percent." J.A. 221.

Dr. Malinek then considered a number of dynamic risk factors taken from the STABLE-2007 scale "that have been statistically liked with both increased recidivism and decreased recidivism." J.A. 221. "Significant Negative Social Influence" for example, is a well-established predictor of general recidivism that, in Dr. Malinek's view, suggests an increased risk of re-offending for Perez, who had "family, friends, and acquaintances who are criminally involved, have past sexual offenses, . . . or who minimize or deny [Perez's] sex crimes." J.A. 223. Specifically, Perez's father lived with him during the time that he kept two Mexican boys in his home and sexually abused them. Dr. Malinek highlighted the impulsive nature of

24

Perez's sexually deviant conduct, exemplified by his having begun molesting his most recent victims immediately after meeting them.  Dr. Malinek also noted that Perez's pedophilia is a chronic condition and that it is unlikely that "his decades-long deviant interest in boys has abated simply as a function [of the] passage of time," J.A. 225; and that Perez has molested new victims while on supervised release or on bond for similar offenses, and that there was no information to suggest that Perez had ever maintained a stable intimate relationship.

Based on his assessment using the foregoing static and dynamic risk factors, Dr. Malinek concluded in his report that Perez met the statutory criteria for civil commitment as a sexually dangerous person.  Dr. Malinek reiterated this opinion during his testimony at the hearing, emphasizing the chronic nature of his long-term pedophilic fixation, and the impulsive and brazen nature of his sexual offense against children:

> [Perez's pedophilia] has spanned for decades, has led him to engage in sexual molestation of multiple boys over a period of 25 years. . . .
>
> . . . His pedophilic urges have repeatedly led him to act out, have been evident in volitional impairments time and again, have been evident in [the] predatory search for victims, have been evident in both opportunistic and predatory crimes, have been evident in recidivism on three occasions . . . and while on conditional release on three separate occasions.
>
> . . .
>
> . . . These are mostly stranger children that he's never met before. . . .

25

. . .

> [T]here is no evidence that he had developed any emotional attachment or relationship with these kids. It looks like this was a predatory search for the primary purpose of sexual victimization to me.

J.A. 127-130. Dr. Malinek viewed the impulsive and public nature of Perez's offenses as particularly illustrative of the danger he poses to his preferred victims:

> The crimes here are both impulsive and predatory . . . in the sense that he takes advantage of an opportunity when it presents itself, there's always a significant level of impulsivity evident in it.
>
> The reference to crimes occurring in a public place, in the changing room of a Dillard department store in 1982 or in the street as happened in November of 1982, clearly speaks to . . . brazen, high-risk behavior, [in view of] the fact that he could be detected, or that the mother of the boy he molested who he was trying to sell newspapers to, she could identify him.
>
> . . . [T]he urge develops very quickly, he acts out on it right away in a public place.

J.A. 131. Finally, Dr. Malinek testified that Perez's statements to Dr. Plaud within six months of the hearing reaffirmed his opinion that Perez would have difficulty refraining from child molestation. Specifically, Perez's admission that he never had sexual relations with an adult female "means that he is probably an exclusive, fixated pedophile" and that "kids are his only way to meet his sexual needs." J.A. 140. Moreover, Dr. Malinek observed that his "presentation of himself" to Dr. Plaud as interested in adult heterosexual relationships suggested he was in denial of his

26

disorder and therefore unlikely to change simply with the passage of time.

Dr. Ross also provided a written evaluation addressing Perez's sexual dangerousness under § 4248. Like Dr. Malinek, Dr. Ross assessed Perez's statistical risk of recidivism using static risk factors under the Static-99R scale and then further evaluated the statistical results in light of various dynamic risk factors taken from the STABLE-2007 scale. Dr. Ross scored Perez a 3 on the Static-99R, which put him in the low-moderate risk category "with about a 9.3% likelihood for being arrested or convicted of a new sexual offense within 5 years post-incarceration and about a 14.5% likelihood . . . in 10 years." J.A. 197. Dr. Ross, however, noted that her score underestimated his actual risk due to the scoring of his age under the Static-99R, which reflects the general tendency for an offender's risk of reoffending to decrease significantly after age 60. Dr. Ross concluded that "[t]his does not seem likely in Mr. Perez's case, however, due to his long history of sexual offending, as well as the fact that his most recent offenses (which occurred when he was between 45 and 47 years old) were also his most egregious." J.A. 196. Ultimately, Dr. Ross opined that Perez would have serious difficulty refraining from child molestation upon release from prison.

27

At the hearing, Dr. Ross strengthened her opinion based on Perez's statements as recounted by Dr. Plaud. Dr. Ross testified that she would now score Perez a 4 on the Static-99R, as did Dr. Malinek, in view of Perez's admission—of which Dr. Ross was previously unaware—that he has never had a sexually intimate relationship with an adult. Dr. Ross also emphasized many of the same factors that Dr. Malinek found suggestive that Perez would experience serious difficulty refraining from child molestation, including the impulsive, brazen and public nature of his pedophilic offenses; the chronic nature of Perez's disorder; and his refusal to participate in sexual offender treatment.

Dr. Plaud, who was initially engaged on behalf of Perez, was also called by the government to testify. In a written evaluation prepared pre-trial, Dr. Plaud reported that although "from a statistical perspective Mr. Perez is at this time [a] low risk to re-offend sexually . . . , there is evidence that he may have ongoing and serious difficulty in refraining from further acts of child molestation if he were released." J.A. 230. Dr. Plaud concluded finally that "[a]t best the data in this case are equivocal; however, I cannot opine that Mr. Perez is not a sexually dangerous person at this time." J.A. 231. At the evidentiary hearing, however, Dr. Plaud unequivocally stated that he considered Perez "sexually dangerous" under the

28

Act:  "I am unpersuaded that [Perez] has developed the skills to control his sexual behavior as a function of increased age, because I think he is so actively denying the very basis of his sexual arousal towards pre-pubescent-aged males . . . .  That's why I think he's sexually dangerous."  J.A. 112-13.

Although the district court recognized and considered the statistical rates of recidivism based on the various actuarial scales, the court explained that it "affords them less weight than respondent's past and current conduct, and the testimony of the experts as a whole."  J.A. 179.  The district court noted that each of the testifying experts identified several factors as indicative of Perez's lack of volitional control, including Perez's impulsivity, failure to cooperate while on supervised release, and his brazen and risky behavior despite previous legal sanctions.  The district court also gave significant weight to Perez's lack of sex offender treatment and his apparent denial of pedophilic sexual interest.  And, the district court concluded, based on testimony from all three experts, that Perez's age did not mitigate his risk of recidivism in light of all of the other risk factors.

In sum, the district court carefully considered the evidence before it, and its factual findings represent a permissible and reasonable interpretation of the evidence presented at the hearing.  Because we are not "left with the

29

definite and firm conviction that a mistake has been committed" by the district court, Hall, 664 F.3d at 462 (internal quotation marks omitted), we cannot say that the district court clearly erred in finding, by clear and convincing evidence, that Perez is sexually dangerous within the meaning of the Act.

V.

Finally, Perez contends that (1) the Act deprives him of equal protection under the Fifth and Fourteenth Amendments, and (2) the Act imposes an unconstitutional criminal punishment. Both of these arguments are foreclosed by our decision in Timms. See 664 F.3d at 449, 455. Accordingly, we reject these arguments.

VI.

For the foregoing reasons, the order of the district court is

AFFIRMED.